**Brian THOMAS, Petitioner,**

v.

**Jeffrey BEARD, Acting Secretary of Corrections, et al., Respondent.**

**Civil Action No. 00–803.**

United States District Court,
E.D. Pennsylvania.

Aug. 19, 2005.

Billy H. Nolas, Kathy Swedlow, Defender Association of Philadelphia, Victor Julio Abreu, Federal Public Defender's Office, Philadelphia, PA, for Petitioner.

Robert M. Falin, Thomas W. Dolgenos, District Attorney's Office, Philadelphia, PA, for Respondent.

## OPINION

POLLAK, District Judge.

### I.

On February 6, 1986, a jury empaneled in the Court of Common Pleas of Philadel-

phia County convicted Brian Thomas of murder in the first degree, burglary, involuntary deviate sexual intercourse, and rape. In a separate proceeding, the same jury sentenced Thomas to death. At issue today is Thomas's federal habeas corpus petition filed pursuant to 28 U.S.C. § 2254. In this petition, Thomas claims that his trial and sentencing hearing were infected with constitutional error, and he seeks release or a new trial, or, at a minimum, a new sentencing hearing.

## II.

The evidence adduced at trial discloses the following: On August 9, 1985, at about 7:00 PM, St. Clair Holman, who rented a room in the Philadelphia apartment of Linda Johnson and her boyfriend, Irving Furlow, entered the apartment. On opening the door, Holman saw that the apartment had been ransacked. In his own room, Holman found that his television set, and also a can in which he had approximately $29 in change, were missing. In Linda Johnson's room, her dead body hung face-down on a broken box spring. Johnson's eyes and face were swollen and her nose and right temple were bleeding. There was a bite mark on her cheek, and there were bruises on her arms and thighs. The victim was nude from the waist down, and blood was oozing from her vagina and rectum.

An autopsy revealed that, in addition to the injuries just described, Johnson sustained three fractured ribs, and a twenty-three inch tear reaching from the vagina and diaphragm up into the chest cavity. The autopsy also found that, with the use of a blunt instrument, a shirt had been inserted into Johnson's rectum, through the intestinal wall and into her abdominal cavity. A blood-encrusted crutch was found near her body. The medical evidence also indicated that the victim was still alive when the shirt was inserted into her rectum. Finally, there was evidence that sperm was deposited in the victim between 5:00 PM and 6:30 PM.

The Commonwealth relied on the evidence summarized above to establish that Linda Johnson was raped, that her death was a homicide, and that the homicide was intentional and malicious. At sentencing, the Commonwealth used the guilt-phase evidence to establish two of the aggravating factors that it invoked, successfully, to support a sentence of death: that the murder was committed during the course of a felony—namely, rape—and that the murder involved torture.

To identify Thomas as the perpetrator, the Commonwealth adduced the following evidence: First, the officer who was first to arrive at the scene of the crime testified that he had seen Johnson with Thomas only two hours before, when he was investigating Johnson's complaint of a stolen purse. Second, Holman testified that he had seen Johnson and Thomas together at 5:45 PM. Third, a friend of Thomas's testified that he had seen Thomas with Johnson at a bar across the street from her apartment during the late afternoon. Fourth, the sperm found in Johnson was deposited by a non-secretor (i.e., one who does not secrete traces of blood in his body fluid emissions), and Thomas's blood was analyzed and typed to be that of a non-secretor. Fifth, blood found on his boxer shorts was determined to be human blood. Sixth, an impression of Thomas's teeth fit with the bite mark left on Johnson's cheek. Finally, the television set and $29 taken from Holman's room were found in Thomas's possession.

The judge presiding at trial and sentencing was the Honorable Edwin Malmed. Thomas was represented by court-appointed counsel. On February 6, 1986, a jury found Thomas guilty of murder in the first degree, rape, involuntary deviate sexual intercourse, and burglary.

At the penalty phase that followed later in the day, the Commonwealth relied upon three aggravating factors. Two of these—killing in the course of another felony, and torture—have been referred to above. The third aggravating factor was a significant history of violent felony convictions, *see* 42 Pa.C.S. § 9711(d)(6),(8),(9). To establish the third aggravating factor, the Commonwealth invoked (1) Thomas's 1978 conviction for felonious aggravated assault and indecent assault on a three-year old who suffered injuries to his rectum and intestines, and (2) Thomas's 1984 conviction for criminal trespass, wherein Thomas had unlawfully entered the home of a neighbor and then climbed into bed with her while she was sleeping.

At the start of the penalty phase, counsel for Thomas advised the court, in the absence of the jury, that his client would present no mitigating evidence. The court ruled that Thomas should be colloquied regarding his decision to forego mitigating evidence, and Thomas was then questioned about his decision. Immediately following the colloquy, the prosecution offered to stipulate to Thomas's age and to the fact that he had a high school diploma, but Thomas, through counsel, declined the offer.

The jury found the three proposed aggravating factors and no mitigating factors, and it voted death. Thomas's post-verdict motions were argued and denied, and the trial court sentenced Thomas to death on the first-degree murder conviction, and to consecutive terms of imprisonment for a maximum of fifty years for the burglary, rape and involuntary deviate sexual intercourse convictions.

On June 17, 1989, the Pennsylvania Supreme Court issued its opinion in Thomas's automatic direct appeal, *see* 42 Pa.C.S. § 9711(h)(1). Thomas, via a new court-appointed attorney, challenged the sufficiency of the guilt-phase evidence, and con-

tested the evidence underpinning the aggravating factors found by the jury in the penalty phase. As to the guilt phase, Thomas argued that the burglary conviction was improper because the evidence suggested that his entry into Johnson's apartment was authorized; that the evidence was insufficient to support his conviction for involuntary deviate sexual intercourse; that there was no evidence that he penetrated Johnson and hence that his rape conviction was improper; that it was prejudicial to admit testimony from the medical examiner that Johnson would have experienced pain as a result of the insertion of the shirt into her rectum; and that a hatchet found at the murder scene should not have been admitted into evidence. Regarding his sentence, Thomas argued that the evidence did not support a finding that the murder was committed *during* the course of the burglary, rape or involuntary deviate sexual intercourse; that the crime of criminal trespass did not constitute a prior *violent* felony; that the court's torture instruction was improper; and that there was insufficient evidence to support a finding of torture. The Commonwealth argued that none of Thomas's claims had been raised in post-verdict motions, and so these were waived. The Pennsylvania Supreme Court rejected the Commonwealth's waiver argument, noting that "in death penalty cases, we relax the waiver rule at times and address the merits of arguments raised for the first time in the direct appeal to this court." *Commonwealth v. Thomas*, 522 Pa. 256, 561 A.2d 699, 704 (1989) (*Thomas–I* ). On addressing the merits, the court sustained the convictions and the death sentence.

In 1992, Thomas sought collateral relief from his convictions and sentence by filing a petition under Pennsylvania's Post–Conviction Relief Act, 42 Pa.C.S.A. § 9541 *et seq.* (hereinafter "PCRA"). Thomas was represented by yet another court-appoint-

ed attorney. Thomas's amended PCRA petition expressly acknowledged the federal constitutional underpinning of Thomas's claims, stating that Thomas's waiver of the right to present mitigating evidence was constitutionally deficient, and that trial and appellate counsel's performance was ineffective in violation of the Fourth, Fifth, Sixth, and Eighth Amendments of the Constitution.

Thomas's PCRA counsel requested an evidentiary hearing, but the Court of Common Pleas, sitting as the PCRA court, denied the request, having determined that a decision could be made from the existing record. *Commonwealth v. Thomas,* No. 2716 (Pa.Commw.Ct., 1st Jud. Dist., Sept. 13, 1995). The PCRA court noted that Thomas would not be entitled to review of any claim that had been previously litigated or waived, but it nonetheless considered the merits of each claim of error, and, in an opinion of September 13, 1995, found them all to be wanting, and hence denied PCRA relief.

In his appeal from the denial of PCRA relief, Thomas's PCRA counsel was joined by another attorney, then of the Center for Legal Education, Advocacy, and Defense Assistance and now of the Capital Habeas Unit of the Federal Defenders Association, who is one of Thomas's current habeas counsel. The PCRA appeal brief raised twenty-three claims of error, and argued that, in light of the Pennsylvania Supreme Court's policy of relaxing the waiver bar in death penalty cases, all of these claims of error were properly before the court. Twenty-one of the twenty-three claims in Thomas's PCRA appeal brief appear in his habeas petition. For the sake of brevity, Thomas's claims are listed in the form and order in which they appear in the habeas petition; the number by which each claim was designated in the PCRA appeal brief appears in arabic numerals in parentheses following each claim below:

Claim I (Claim 1 in PCRA appeal brief)—Trial counsel was ineffective for failing to investigate, develop and present mitigating evidence concerning Thomas's background and longstanding mental illness;

Claim II (Claim 6)—Thomas was not competent to waive his right to present mitigating evidence and his waiver was not knowing, intelligent and voluntary;

Claim III (Claims 4 and 5)—Trial counsel was per se ineffective;

Claim IV (Claim 2)—The trial court erred when, after receiving the Pre–Sentence Investigation Report, which stated that Thomas suffered from psychological impairments, the court failed to order an investigation into Thomas's competency to waive his right to present mitigating evidence;

Claim V (Claim 3)—Thomas was denied due process of law if his counsel was not provided with the Pre–Sentence Investigation Report, and there is no indication in the record that counsel did receive that report;

Claim VI (Claim 7)—The trial court's instruction on the torture aggravating circumstance was vague, overbroad and erroneous;

Claim VII (Claim 8)—The prosecutor engaged in misconduct during the guilt phase by invoking his own expertise, referring to the sentencing phase, and speculating as to the victim's pain and suffering;

Claim VIII (Claim 9)—The prosecutor engaged in misconduct at the sentencing phase by invoking his own experience, referring to Thomas's future dangerousness, and appealing to the Bible;

Claim IX (Claim 14)—The trial court erred in failing to instruct the jury that life imprisonment entailed no possibility of parole;

Claim X (Claim 10)—The prosecutor engaged in misconduct when he threatened Thomas's wife during the course of the trial;

Claim XI (Claim 11)—The trial court erred in admitting the inherently suspect testimony of an expert in bite-mark identification;

Claim XII (Claim 12)—Thomas's prior non-violent convictions for defiant trespass and criminal trespass were improperly used to establish a significant history of prior violent felony convictions;

Claim XIII (Claim 13)—Thomas's conviction and sentence are unreliable because one of the jurors had a hostile relationship with Thomas's wife when the two were in high school;

Claim XIV (Claim 15)—The penalty phase jury instructions violated *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988);

Claim XV (Claim 16)—Thomas's due process rights were violated because the jury was death-qualified but not life-qualified;

Claim XVI (Claim 17)—The trial court erred at the guilt phase in defining "reasonable doubt" as a doubt that would cause one to "restrain from acting"—a formulation that lessened the prosecution's burden of proof;

Claim XVII (Claim 18)—The trial court erred in failing to provide the jury with any "reasonable doubt" instruction at the penalty phase, relying instead upon the faulty "reasonable doubt" instruction given at the guilt phase;

Claim XVIII (Claim 19)—The trial court's instruction regarding the meaning of the "preponderance of the evidence" standard by which Thomas had to establish mitigating evidence was inadequate;

Claim XIX (Claim 21)—Trial counsel was ineffective for failing adequately to cross-examine St. Clair Holman, failing to call additional witnesses who could have established that the victim's boyfriend was the perpetrator, and failing to object to the introduction into evidence of Holman's hatchet;

. . .

Claim XXIII (Claim 23)—Thomas is entitled to a new trial and sentencing proceeding because the prejudicial effect of the cumulative errors in this case undermines confidence in the verdict and sentencing.

In addition to the claims listed above, the PCRA appeal brief advanced the following claims:

Claim 20—Trial counsel was ineffective for failing to conduct any crime scene investigations, obtain expert testimony, object to the illegal seizure of Thomas's teeth impressions, or litigate in suppression the overly suggestive identification of Thomas by St. Clair Holman;

Claim 22—A remand to the Court of Common Pleas was required for an evidentiary hearing on the location of sketches used by the prosecution at trial, so that these sketches could be compared to prejudicial photographs of the victim introduced at trial.[1]

On January 18, 2000, the Pennsylvania Supreme Court rendered its opinion. *Commonwealth v. Thomas,* 560 Pa. 249, 744 A.2d 713 (2000) (*Thomas–II*). It considered the following claims to be previously litigated because it had decided these on direct appeal, and it thus declined to review these claims again: Trial counsel was ineffective for failing to investigate or present mitigating evidence (Claims 1 and

---

1. The habeas petition contained three other claims not present in the PCRA appeal brief. These are presented below, *see infra* Part III.

5 of Thomas's PCRA appeal brief, which became Claims I and III of his habeas petition); at the penalty phase, the trial court gave an inappropriate instruction regarding torture (Claim 7, which became Claim VI of Thomas's habeas petition); Thomas's prior conviction for criminal trespass should not have formed the basis of a finding that he had a significant history of violent felony offenses (Claim 12, which is also Claim XII of Thomas's habeas petition); defense counsel was ineffective for failing to object to the admission of a hatchet (a portion of Claim 21, which became Claim XIX of Thomas's habeas petition); and Thomas was denied counsel altogether at the penalty phase since his counsel did not present any evidence in mitigation (Claim 4, which became Claim III of Thomas's habeas petition). *See generally Thomas–II*, 744 A.2d at 714 n. 3.

The court found that the majority of the remaining claims were waived and, pursuant to 42 Pa.C.S. § 9543(a)(3),[2] it declined to review these as well. More specifically, the court found that the following claims were waived because they were raised for the first time in Thomas's PCRA appeal brief: Claim 2 (Claim IV), Claim 3 (Claim V), Claim 13 (Claim XIII), Claim 14 (Claim IX), Claim 17 (Claim XVI), Claim 18 (Claim XVII), Claim 19 (Claim XVIII), so much of Claim 8 as contended that it was prosecutorial misconduct for the prosecutor to refer to the sentencing phase during the guilt phase (relevant portions of Claim VII), Claim 10 (Claim X), and Claim 23 (Claim XXIII). *See generally Thomas–II*, 744 A.2d at 715 n. 4. In addition, the court found that other claims had been waived because they alleged ineffectiveness of trial counsel, but not appellate counsel, even though they were raised for the first time in Thomas's amended PCRA petition:

Claim 6 (Claim II), Claim 11 (Claim XI), Claim 16 (Claim XV), so much of Claims 8 and 9 as referred to the prosecutor's improper invocations of his own experience (relevant portions of Claims VII and VIII, respectively), so much of Claim 8 as referred to the prosecutor's statements about the victim's pain and suffering (relevant portions of Claim VII), and so much of Claim 9 as referred to the prosecutor's statements about Thomas's future dangerousness (relevant portions of Claim VIII). *See generally Thomas–II*, 744 A.2d at 715 n. 4.

The court addressed the merits of Claim 15 (Claim XIV), which stated that counsel was ineffective for failing to object to the court's penalty phase instructions. More specifically, Thomas there argued that the instructions violated *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), because they failed to inform the jury that it was not required unanimously to find mitigating circumstances. Because *Mills* had not been decided at the time of Thomas's trial, the court rejected the contention that counsel was ineffective for failing to object to the trial court's instructions.

The court rejected Claim 20 (not raised in Thomas's habeas petition) on the ground that Thomas had either failed to establish the deficiency of the various omissions attributed to trial counsel, or had failed to establish prejudice as a result of those omissions.

The court also rejected the portions of Claim 21 that had not been previously litigated. These alleged that counsel was ineffective for failing adequately to cross-examine Holman, failure to call other witnesses whose testimony might have raised an inference that the victim's boyfriend

**2.** 42 Pa.C.S. § 9543(a)(3) provides that, "[t]o be eligible for relief under [the PCRA], the petitioner must plead and prove by a preponderance of the evidence" that "the allegation of error has not been previously litigated or waived."

was the murderer, and failure to object to the admission in evidence of a hatchet. The Pennsylvania Supreme Court found that trial counsel's decisions were reasonable and hence did not amount to a deficient performance.

Finally, the court dismissed as frivolous Claim 22 (not raised in Thomas's habeas petition), which requested a remand to the Court of Common Pleas for an evidentiary hearing on the location of sketches used by the prosecution at trial. Thomas's counsel sought these sketches in order to compare them with allegedly prejudicial photographs of the victim introduced at trial after counsel "opened the door." The court reasoned that the photographs were themselves a part of the record and had been made available to Thomas's counsel, and that an evaluation of their potential to prejudice the jury could be made without comparing them to the prosecution's sketches.

Having found that the bulk of the issues raised by Thomas had been previously litigated or waived, and that the remainder were meritless, the Pennsylvania Supreme Court affirmed the Court of Common Pleas' denial of Thomas's PCRA petition.

### III.

As noted above, in addressing Thomas's appeal from the Court of Common Pleas' denial of Thomas's PCRA petition, the Pennsylvania Supreme Court found that the majority of his claims had either been previously litigated or had been waived, and hence the court did not examine their merits. Of the twenty-three claims raised in Thomas's petition for federal habeas corpus relief, only two of these—Claim XIV (which was Claim 15 in Thomas's

PCRA appeal), a claim alleging a violation of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and Claim XIX (Claim 21 in Thomas's PCRA appeal), a claim alleging ineffective assistance for failing to (a) adequately cross-examine Holman, (b) call certain witnesses, and (c) object to admission into evidence of a hatchet—were addressed on the merits by the Pennsylvania Supreme Court when it heard Thomas's PCRA appeal. Of the remaining claims, Claims I, III, VI and XII of his habeas petition, as well as Claim XIX to the extent it deals with admission of a hatchet into evidence, were deemed previously litigated, *Thomas–II*, 744 A.2d at 715 n. 3, and claims II, IV, V, VII, VIII, IX, X, XI, XIII, XV, XVI, XVII, XVIII, and XXIII were deemed waived, *Thomas–II*, 744 A.2d at 715 n. 4.

Three claims not raised in Thomas's PCRA appeal are presented in Thomas's habeas petition. These claims are as follows:

Claim XX—The trial court erred in permitting testimony during the guilt phase regarding torture of the victim;[3]

Claim XXI—Trial counsel was ineffective for failing to object to the testimony of the Commonwealth's hair expert;

Claim XXII—The trial court erred at the penalty phase in permitting two police officers to testify to the inflammatory details of Thomas's prior convictions.[4]

### A.

The Third Circuit outlined the scope of review of § 2254 habeas petitions in *Lines v. Larkins*, 208 F.3d 153 (3d Cir.2000):

Petitioners who have not fairly presented their claims to the highest state

---

3. This claim was raised, and its merits were considered, by the Pennsylvania Supreme Court in its direct review of Thomas's convictions and sentence. *See Thomas–I*, 561 A.2d at 706–707. This claim is thus exhausted.

4. Thomas has subsequently withdrawn this claim.

court have failed to exhaust those claims. If, however, state procedural rules bar a petitioner from seeking further relief in state courts, the exhaustion requirement is satisfied because there is "an absence of available State corrective process." 28 U.S.C. § 2254(b). Even so, this does not mean that a federal court may, without more, proceed to the merits. Rather, claims deemed exhausted because of a state procedural bar are procedurally defaulted, and federal courts may not consider their merits unless the petitioner establishes "cause and prejudice" or a "fundamental miscarriage of justice" to excuse the default. *Id.* at 160 (internal citations omitted).

■ A claim "deemed exhausted because of a state procedural bar," *id.,* is not open to examination on federal habeas if the state procedural bar is not a procedural rule constituting "an independent and adequate state ground barring our review of a federal question," *Hathorn v. Lovorn,* 457 U.S. 255, 262, 102 S.Ct. 2421, 72 L.Ed.2d 824 (1982). But, "a state procedural ground is not 'adequate' unless the procedural rule is 'strictly or regularly followed.' State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims." *Id.* at 262–63, 102 S.Ct. 2421 (quoting *Barr v. City of Columbia,* 378 U.S. 146, 149, 84 S.Ct. 1734, 12 L.Ed.2d 766 (1964)).

■ Thus, a federal court may exercise jurisdiction over a procedurally defaulted claim if any one of three circumstances holds—first, where the default is *caused* by circumstances outside of the petitioner's control and the petitioner suffers *prejudice* therefrom; second, where adherence to the state procedural rule will result in a

*fundamental miscarriage of justice;* and third, where the state procedural rule is not adequate because it is not "firmly established, readily ascertainable, and regularly followed," *Szuchon v. Lehman,* 273 F.3d 299, 325 (3d Cir.2001).

**B.**

Thomas faces three potential sources of procedural default—a bar against previously litigated claims, 42 Pa.C.S. § 9543(a)(3); a bar against waived claims, *id.;* and a statute of limitations, 42 Pa.C.S. § 9545(b).

### *Previously Litigated Claims*

To be eligible for relief under the PCRA, "the petitioner must plead and prove by a preponderance of the evidence" that "the allegation of error has not been previously litigated...." 42 Pa.C.S. § 9543(a)(3). Further, 42 Pa.C.S. § 9544(a) provides that an issue has been previously litigated if:

(1) Deleted.[5]

(2) the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue; or

(3) it has been raised and decided in a proceeding collaterally attacking the conviction or sentence.

In Thomas's PCRA appeal opinion, the Pennsylvania Supreme Court stated that a number of Thomas's claims—the claims that in the habeas petition are I, III, VI, XII, and a portion of XIX—had "previously been decided by this Court on direct appeal; therefore, those claims will not be reviewed." *Thomas–II,* 744 A.2d at 714.

---

**5.** Clause (1) had not yet been deleted at the time of Thomas's initial PCRA proceeding. At that time, the provision stated that "an issue has been previously litigated if: (1) it has been raised in the trial court, the trial court has ruled on the merits of the issue and the petitioner did not appeal;...." 42 Pa.C.S. § 9544(a)(1).

*Claims I, III, and XII*

The claims deemed previously litigated by the Pennsylvania Supreme Court are reproduced in Thomas's habeas petition as Claims I, III, VI, XII, and a portion of Claim XIX. Claims I and III allege ineffectiveness of counsel for counsel's failure to investigate or present mitigating evidence. In disposing of these claims in Thomas's PCRA appeal, the Pennsylvania Supreme Court stated that "[t]he issue of the presentation of mitigating evidence, *in all its possible manifestations,* was determined by this Court's previous decision." *Thomas–II,* 744 A.2d at 714 n. 3 (emphasis added). Taking the Pennsylvania Su-

preme Court at its word, then, it is apparent that Claims I and III are not procedurally defaulted; instead, these claims have been fully exhausted.[6] Similarly, the substance of Claim XII was the same in Thomas's direct appeal brief and his PCRA appeal brief. Thus, this claim also received review on the merits. Accordingly, Claims I, III, and XII are properly before this court.[7]

*Claims VI and XIX*

The substance of Claim VI and of the hatchet aspect of Claim XIX differed between Thomas's direct appeal and PCRA appeal brief. As a general matter, a claim will be regarded as previously litigated but

---

**6.** Despite the Pennsylvania Supreme Court's statement that "all [] possible manifestations" of claims alleging ineffectiveness of counsel for a failure to present mitigating evidence had been determined by the Court on direct appeal, 744 A.2d at 714 n. 3, it seems appropriate to observe that the scope of the ineffectiveness claims raised on direct appeal does not appear to be coextensive with the scope of the ineffectiveness claims raised in Thomas's PCRA appeal brief. In his PCRA appeal brief Thomas argued that counsel was ineffective for failing to investigate or present evidence relating to his extensive mental health history. To this end, Thomas reproduced excerpts from three psychological evaluations that Thomas had undergone prior to Johnson's murder, *see* Thomas's PCRA Appeal Br. at 8–14, and he appended five such reports, *see* Ex. 2–5 to Thomas's PCRA Appeal Br. By contrast, no mention of Thomas's mental health history was made in Thomas's direct appeal brief. Instead, to the extent that Thomas's direct appeal brief alleged ineffective assistance for failing to present mitigating evidence, it focused exclusively on Thomas's relatively young age, his attainment of a high school diploma and hairdressing certificate, and the availability of his family members who would have testified to Thomas's good-natured character and his close family. Indeed, while the direct appeal brief includes affidavits from five members of Thomas's immediate family, these are remarkable in their uniform silence regarding Thomas's history of mental illness and the deviant, criminal conduct stemming therefrom. *See generally* Ap-

pellant's Br. for Direct Appeal, Aug. 8, 1988, at 28–31, and accompanying appendix.

Because the failure to investigate or present mitigating mental health evidence presents a substantially different aspect of the claim of ineffective assistance than does the claim alleging a failure to investigate or present mitigating evidence relating to a defendant's age, educational attainments, or general character traits, it does not appear that the Pennsylvania Supreme Court could be said to have actually addressed the merits of Claims I and III on direct appeal. However, as suggested in the text, it would seem that this habeas court, in determining whether claims have been exhausted, should accept the authoritative statement of Pennsylvania's highest court as to what issues that court addressed at an earlier stage of the litigation.

**7.** *Compare Ylst v. Nunnemaker,* 501 U.S. 797, 804, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) ("[T]he later state decision rests upon a prohibition against further state review—for example, an unexplained denial of state habeas resting in fact upon a rule ... preventing the relitigation on state habeas of claims raised on direct appeal. In that circumstance, ... its effect upon the availability of federal habeas is nil...."); *Barclay v. Fla.,* 463 U.S. 939, 946, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) ("Since the Florida Supreme Court held that it had considered Barclay's claims in his first appeal, and simply refused to reconsider its previous decision in the second appeal, those claims are properly before us.").

not exhausted where it is supported by a different legal theory or set of facts. *See, e.g., Commonwealth v. Bracey,* 568 Pa. 264, 795 A.2d 935, 939 (2001) ("a petitioner cannot obtain post-conviction review of claims previously lititgated [sic] on appeal by alleging ineffective assistance of prior counsel and presenting new theories of relief to support previously litigated claims.").

In the version of Claim VI presented to the Pennsylvania Supreme Court on direct appeal, Thomas challenged the instruction regarding torture as an aggravating circumstance, *see* 42 Pa.C.S. § 9711(d)(8), on the ground that the judge failed to make clear that torture requires an intention to cause pain and suffering. By contrast, in the version of Claim VI advanced in Thomas's PCRA appeal brief, Thomas argued that the torture instruction was unconstitutional because the judge's use of the phrase "heinous, atrocious or cruel" was vague, overbroad, and erroneous; the judge's alleged failure to include the element of intent was not mentioned at all.

Similarly, the portion of Claim XIX pertaining to the admission into evidence of a hatchet assumed different forms in the direct appeal and PCRA appeal briefs. In Thomas's direct appeal brief, this claim was presented as an instance of trial court error, while in Thomas's PCRA appeal Thomas alleged ineffectiveness of counsel for failing to object to the hatchet's admission. Thus, the hatchet aspect of Claim XIX, like Claim VI, was previously litigated but not exhausted. *See generally Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 88 (1998) ("a petitioner cannot obtain PCRA review of previously litigated claims by alleging ineffective assistance of counsel and presenting new theories of relief to support the previously litigated claims.").

To the extent that aspects of Claims VI and XIX were presented in Thomas's PCRA filings but not seen by the Pennsylvania Supreme Court on direct review, these claims might be regarded as waived. Whether waiver is an adequate ground for concluding that such aspects of Claims VI and XIX, and other of Thomas's claims, are barred from federal habeas scrutiny, is the next question to be considered.[8]

### Waived Claims

The waiver bar requires the PCRA petitioner to "plead and prove by a preponderance of the evidence" that "the allegation of error has not been ... waived." 42 Pa.C.S. § 9543(a)(3). For purposes of determining whether the waiver bar is a state procedural rule of sufficient clarity and routine application so as to command deference from a federal habeas court, the relevant rule is the one in place at the time Thomas should, assertedly, have complied with the rule, and not the one in place at the time that the Pennsylvania Supreme Court ruled on his direct appeal or his PCRA petition. *See, e.g., Terrell v. Morris,* 493 U.S. 1, 2, 110 S.Ct. 4, 107 L.Ed.2d 1 (1989); *Cabrera v. Barbo,* 175 F.3d 307, 313 (3d Cir.1999); *Doctor v. Walters,* 96

---

8. It may well be that the previous litigation bar itself is not an adequate ground for foreclosing habeas review because the bar was regularly disregarded in Pennsylvania's capital cases. *See, e.g., Commonwealth v. Banks,* 540 Pa. 143, 656 A.2d 467, 475 (1995) (stating in a PCRA appeal that although one of the appellant's issues had "been finally litigated and Appellant [was] not entitled to PCRA relief thereon," the court would, "given the serious nature of the matters before [it], [ ] proceed to address Appellant's claim."); *Commonwealth v. Christy,* 540 Pa. 192, 656 A.2d 877, 886–87 (1995) (stating in a PCRA appeal that although "[m]ost of [appellant's] contentions have been previously litigated," the court would "briefly address the claims" "in light of the circumstances of this appeal ....") (footnote omitted). *But see Commonwealth v. Howard,* 553 Pa. 266, 719 A.2d 233 (1998).

F.3d 675, 684 (3d Cir.1996) ("We must decide whether the rule was firmly established and regularly applied, not in 1993 when the Superior Court relied on it, but rather as of the date of the waiver that allegedly occurred when Doctor escaped in 1986."); *Jacobs v. Horn*, 129 F.Supp.2d 390, 399 (M.D.Pa.2001). Thus, for claims deemed "waived" because they were presented for the first time in Thomas's PCRA petition, the relevant date of the alleged violation would have been prior to the time of the direct appeal, which was decided on June 27, 1989; for claims deemed waived because they were raised for the first time in Thomas's PCRA appeal brief, the alleged violation would have occurred prior to September 13, 1995, when the Court of Common Pleas denied Thomas's PCRA petition. Therefore, this court must look to the version of the waiver bar in effect between 1989 and 1995. *Compare Pursell v. Horn*, 187 F.Supp.2d 260, 293 (W.D.Pa.2002) ("At the earliest, Pursell waived certain issues when he failed to raise them at trial in 1982 or on direct appeal in 1985. At the latest, he waived other issues when he failed to raise them in his PCRA filings with the Pennsylvania Supreme Court in 1994. Accordingly, my inquiry must focus on the state of Pennsylvania waiver law in death penalty cases between 1982 and 1994.") (citations omitted).

The version of the PCRA in effect in 1989, at the time of Thomas's direct appeal, defined an issue as waived if it "has been raised in the trial court, the trial court has ruled on the merits of the issue and the petitioner did not appeal." 42 Pa.C.S. § 9544(1). The statutory language remained unchanged until 1996, many months after Thomas's PCRA petition.[9] While issues deemed waived were formally barred, 42 Pa.C.S. § 9544, the waiver rule was, at least prior to 1998, regularly relaxed.[10]

9. The PCRA was amended on November 17, 1995, P.L. 1118, No. 32 (Spec.Sess. No. 1), § 1. Section 9544(1) was deleted, and a separate provision, designated § 9544(b), was added, which reads: "Issues waived.—For purposes of this subchapter, an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." The amendments were to take effect sixty days after their passage, P.L. 1118, No. 32 (Spec.Sess. No. 1), § 1—i.e., in mid-January of 1996—and the Court of Common Pleas ruled on Thomas's PCRA petition on September 13, 1995. Thus, it is the pre-amendment version of the definition of waiver that applies to Thomas's PCRA filings.

10. Of the numerous Pennsylvania cases relaxing the waiver bar in capital proceedings, the following are representative: *Commonwealth v. DeHart*, 539 Pa. 5, 650 A.2d 38, 48 (1994) (stating, in a case reviewing the lower court's denial of a PCRA petition that, "[a]lthough Appellant concedes that this issue is technically waived because it was not previously raised below, we will nonetheless address it because we have not been strict in applying our waiver rules in death penalty cases"); *Commonwealth v. Morris*, 546 Pa. 296, 684 A.2d 1037, 1042 (1996) ("The Commonwealth argues that all of the issues raised in Appellant's post-conviction petition are waived for failure to raise those issues on direct appeal. While we agree that some of the issues presented could have been raised on direct appeal and thus, could be deemed waived pursuant to the PCRA, we will nevertheless address all of Appellant's claims since the trial court addressed all of those claims and because it is this Court's practice to address all issues arising in a death penalty case irrespective of a finding of waiver."); *Commonwealth v. Morales*, 549 Pa. 400, 701 A.2d 516, 520 n. 13 (1997) ("A finding that appellant waived a claim would not prove fatal since this Court's practice has been to address all waived issues which have been raised in PCRA death penalty petitions."); *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352, 356 n. 6 (1995) (quoting the PCRA waiver bar, and then stating that "[w]e note, however, that it is this Court's practice to address all issues arising in a death penalty case, irrespective of a finding of waiver");

In 1998, the Pennsylvania Supreme Court, in *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 700 (1998), acknowledged that "it has been our 'practice' to decline to apply ordinary waiver principles in capital cases" (internal citation omitted), and announced that it would thenceforth strictly adhere to the waiver bar of the PCRA because its experiences with relaxed waiver had "virtually eliminated any semblance of finality in capital cases," *id.* at 700. The fact that *Albrecht* represented an about-face in the Pennsylvania Supreme Court's treatment of waived claims in capital cases establishes that the effective rule before *Albrecht* was one of no-waiver. Were this not the case, it would have been unnecessary for the *Albrecht* court to express so forcefully and explicitly its newly rigorous policy of refusing to review waived claims. *See, e.g., Pursell v. Horn*, 187 F.Supp.2d 260, 295 (W.D.Pa.2002) ("between 1978 and 1998, the Pennsylvania Supreme Court had a regular practice of forgiving waivers in capital cases, whenever they occurred, and reviewing the merits of a petition."); *Commonwealth v. Pirela*, 556 Pa. 32, 726 A.2d 1026, 1030 (1999) ("Although we have declined to apply ordinary waiver principles to capital cases in the past, we recently held that this practice will be discontinued.") (citing *Albrecht*); *Commonwealth v. Ford*, 570 Pa. 378, 809 A.2d 325, 337 (2002) (Saylor, J., concurring) (noting that, until *Albrecht*, the Pennsylvania Supreme Court "had in effect its policy of relaxed waiver, which was

then applied not only on direct appeal, but also in the post-conviction context.").

Thus, the waiver rule applied in Thomas's PCRA appeal was not adequate because it was not "regularly followed," *Hathorn v. Lovorn*, 457 U.S. 255, 263, 102 S.Ct. 2421, 72 L.Ed.2d 824 (1982). Indeed, as Judge Brody noted in *Baker v. Horn*, 210 F.Supp.2d 592, 636 (E.D.Pa.2002),

> the Third Circuit has held in more than one capital case, and with respect to more than one Pennsylvania procedural rule, that as long as the possibility existed at the time of a prisoner's default that the Pennsylvania courts might apply the relaxed waiver rule to the prisoner's PCRA petition, Pennsylvania law did not clearly foreclose substantive review of claims in the petition, even if the claims were otherwise procedurally defaulted. That the state courts might apply the relaxed waiver rule to a PCRA petition remained a possibility until the Pennsylvania Supreme Court expressly renounced the practice on November 23, 1998 in *Commonwealth v. Albrecht*, 720 A.2d at 700.[11]

In sum, this court finds that the waiver bar is not an adequate state law ground upon which to deny Thomas habeas review of the claims deemed waived in *Thomas–II*. Accordingly, this court will address the merits of Claims II, IV, V, VII, VIII, IX, X, XI, XIII, XV, XVI, XVII, XVIII, X, XXIII, and also the merits of the aspects

*Commonwealth v. Jermyn*, 551 Pa. 96, 709 A.2d 849, 856 (1998) ("this court has addressed all issues arising in a death penalty case, irrespective of a finding of waiver."); *Commonwealth v. Lesko*, 509 Pa. 67, 501 A.2d 200, 207 (1985) (addressing merits of technically waived claim in appeal from denial of a PCRA petition). *See also Banks v. Horn*, 126 F.3d 206, 212 (3d Cir.1997) ("We conclude from *Szuchon, Travaglia*, and *Beasley* that, notwithstanding a procedural bar, it is possible that in a death penalty case the Pennsyl-

vania Supreme Court will not refuse either to entertain a second PCRA petition or to address the claims raised in it.").

**11.** Third Circuit cases finding Pennsylvania procedural bars inadequate in capital cases because not regularly applied include *Banks v. Horn*, 126 F.3d 206 (3d Cir.1997) (finding PCRA bar against claims waived in a first PCRA petition inadequate because infrequently applied), and *Jermyn v. Horn*, 266 F.3d 257 (3d Cir.2001) (same).

of Claim VI and XIX discussed *supra*, under "Previously Litigated Claims."

### Time-barred Claims

Claims XX, XXI, and XXII are raised for the first time in Thomas's federal habeas petition. While Thomas has thus failed to exhaust these claims, he cannot seek state court review of these claims now because, in 1995, Pennsylvania amended its PCRA statute to require that an individual seeking PCRA relief file his petition within one year of his conviction's becoming final on direct appeal. *See* 42 Pa.C.S. § 9545(b); 1995, Nov. 17, P.L. 1118, No. 32 (Spec.Sess. No. 1), § 1.[12] The 1995 amendment took effect in 1996, many months after Thomas's PCRA petition.

The time bar is not an adequate state ground upon which to deny the opportunity for federal relief. As discussed above, in order for a state procedural bar to be deemed "adequate," the state court rule must have been "firmly established and regularly followed" at the time of the habeas petitioner's purported violation of it. *Ford v. Georgia,* 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991). A rule that applies to a petitioner retroactively cannot satisfy the adequacy requirement because it was not established at all, let alone "firmly established and regularly followed," at the time that the petitioner would assertedly have violated it. Accordingly, Claims XX, XXI, and XXII are within the scope of merits inquiry by this court.[13]

## IV.

This opinion now turns to the merits of Thomas's numerous claims. It treats together Claims I and II, which allege respectively that trial counsel was ineffective for failing to investigate or present mitigating evidence, and that Thomas's waiver of the right to present mitigating evidence was not knowing, intelligent, or voluntary. The remaining claims are addressed separately, in the order presented in Thomas's petition.

### Claim I—Failure to investigate and present mitigating evidence; and Claim II—Absence of a knowing, intelligent, and voluntary waiver of the right to present mitigating evidence

Thomas contends trial counsel's failure to investigate and present mitigating evidence at sentencing regarding his mental

---

**12.** Section 9545 provides, with limited exceptions none of which applies here, that any PCRA petition, "including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final." § 9545(b)(1).

In a series of decisions beginning in 1998, the Pennsylvania Supreme Court applied this amendment to the PCRA retroactively. *See, e.g., Commonwealth v. Peterkin,* 554 Pa. 547, 722 A.2d 638 (1998); *Commonwealth v. Banks,* 556 Pa. 1, 726 A.2d 374 (1999). Thomas's conviction became final on June 27, 1989, when the Supreme Court affirmed Thomas's conviction and sentence on direct appeal. Thus, as a result of the Pennsylvania Supreme Court decisions just cited, the time for Thomas to seek PCRA relief expired on June 27, 1990. It would thus be futile for Thomas to seek to exhaust any claims that the

Pennsylvania courts had not yet had an opportunity to review.

**13.** Cf. *Reynolds v. Ellingsworth,* 843 F.2d 712, 722 (3d Cir.1988) ("'[F]ederal courts should generally determine questions of procedural default according to the habeas waiver law in effect at the time of the asserted waiver, and [ ] retroactive effect should not be given to such statutes.'") (quoting *Spencer v. Kemp,* 781 F.2d 1458, 1469 (11th Cir.1986) (en banc)); *Bronshtein v. Horn,* 404 F.3d 700, 709 (3d Cir.2005) (holding that the time bar against successive PCRA petitions was inadequate when applied to petitioner in 1998 because "the state procedural rule at issue in this case—the rule strictly requiring a capital defendant to file a PCRA petition within one year after the end of direct review—was not firmly established and regularly followed at the time in question.").

health constituted ineffective assistance of counsel.

Claims of ineffective assistance of counsel are evaluated under the two-pronged test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To succeed on such a claim, Thomas must show both deficient performance of counsel, based on an objective standard of reasonableness, and prejudice as a result of such deficiency, such that confidence in the result of the original sentencing proceeding is undermined. *Id.* at 694, 104 S.Ct. 2052.

## A.

Although the Supreme Court's recent ruling in *Rompilla v. Beard,* —— U.S. ——, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), sheds further light on precisely what is required of counsel, the duty to investigate potentially mitigating evidence was already well established as a requirement of *Strickland. See Marshall v. Hendricks,* 307 F.3d 36, 99–107 (3d. Cir.2002). Quoting with approval from Justice Brennan's concurring opinion in *Strickland,* the Third Circuit in *Hendricks* held that

> [the] right to present, and to have the sentencer consider, any and all mitigating evidence means little if defense counsel fails to look for mitigating evidence or fails to present a case in mitigation at the capital sentencing hearing. Accordingly, counsel's general duty to investigate takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death.

307 F.3d at 99 (quoting *Strickland,* 466 U.S. at 706, 104 S.Ct. 2052 (Brennan, J., concurring) (internal quotation omitted)) (alteration in original). Further interpreting this duty, the Supreme Court recently held that this investigation " 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' " *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1(C), p. 93 (1989)).

Although much is expected of trial counsel, it is also true that *Strickland* calls for great deference to attorneys' decisions not to carry out a particular investigation, and for a general presumption of reasonableness of attorneys' actions, particularly in the absence of a record on which to judge counsel's performance. 466 U.S. at 690, 104 S.Ct. 2052. In assessing reasonableness, "hindsight is discounted by pegging inadequacy to 'counsel's perspective at the time' investigative decisions are made." *Rompilla,* 125 S.Ct. at 2462 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). There is no bright-line rule concerning the extent of an investigation— how far an attorney must go is largely based on context. "A court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins,* 539 U.S. at 527, 123 S.Ct. 2527. "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id.* at 533, 123 S.Ct. 2527.

Even more important here is *Strickland's* holding that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . . . And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.* at 691, 104 S.Ct. 2052. Howev-

er, the Supreme Court in *Rompilla,* noting that "we long have referred [to ABA standards] as guides to determining what is reasonable," 125 S.Ct. at 2466 (internal quotation omitted), was at pains to quote the following ABA standard relating to counsel's duty to investigate:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

1 ABA Standards for Criminal Justice: Prosecution Function and Defense Function 4–4.1 (2d ed. 1982 Supp.).

In addition, courts interpreting *Strickland* have held that there comes a point when a defendant's actions should signal the need for further investigation by counsel. The Third Circuit has recently made this obligation clear, specifically instructing that, in the context of mental health evidence, certain aspects of a defendant's behavior, regardless of whether the defendant himself provides any information, should alert an attorney that a potentially mitigating condition exists. *See Jacobs v. Horn,* 395 F.3d 92, 101–103 (3d Cir.2005) ("At the time counsel decided not to investigate further, he knew or should have known from Jacobs' behavior and from his interactions with Jacobs that he should initiate some investigation of a psychological or psychiatric nature."). This remains the case when a defendant refuses to contribute to his own case, or even where a defendant actively obstructs counsel's performance. *See Rompilla,* 125 S.Ct. at 2462.

■ In the instant case, there is no evidence that trial counsel (a) obtained mental health records pertaining to Thomas's past offenses and treatment; (b) sought out, fully interviewed, and presented helpful testimony from family members and others familiar with Thomas's background; or (c) worked with a mental health expert to examine Thomas and present testimony regarding mental health-related mitigating circumstances. Had such inquiries been made, trial counsel would have been able to present an extensive clinical record—both documentary and testimonial—of a long history of mental illness, including repeated diagnoses of paranoid schizophrenia and an inability to control aggressive impulses.[14]

---

14. For example, a psychological evaluation from June 23, 1976, following Thomas's conviction for the sexual assault of an infant girl, stated that Thomas has "very poor control over aggressive impulses which may lead to explosive, impulsive behavior at any time." Evaluation of Eva Wojciechowski, Ex. M. At 1. A follow-up evaluation, performed in September, 1977, stated that personality tests "reveal[ed] serious mental disturbance." Evaluation of Iris Jourdan, Ex. I at 3. The evaluation explained that "[w]hat happens in serious mental illness is that sometimes unconscious tendencies slip out. In Brian[ Thomas's] case, this is the probable cause of the sex crimes." *Id.* at 2. An earlier evaluation conducted at Pennsylvania Hospital's Hall–Mercer Center, to which Thomas was admitted following his assault of a horse, diagnosed Thomas with "Passive–Aggressive Personality" and stated that he has "a great deal of difficulty with his aggression and anger." Evaluation of Dr. Dwight Ashby, Ex. L. at 2. Finally, the findings reported in these evaluations are consistent with those made by Lawrence Byrne, who evaluated Thomas on the day that the jury handed down its verdict in the Linda Johnson case. Byrne described Thomas "as suffering from Severe Multiple Personality Disorders," and continuing to exhibit "Sociopathic, Reactive Paranoid, and

In light of the clear duty of defense counsel to investigate such matters, reiterated most recently in *Rompilla,* the failure of Thomas's counsel to do so does rise to the level of a *Strickland* deficiency. *See also Williams v. Taylor,* 529 U.S. 362, 395–96, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (failure to inquire into various aspects of defendant's background, including possible mental handicap); *Jacobs,* 395 F.3d at 103 (failure to obtain medical records demonstrating mental deficiencies).

Affidavits from Thomas's family members state that counsel never interviewed them, even though these family members were ready and willing to testify on Thomas's behalf, particularly concerning Thomas's acts of kindness toward others and the close relationship he enjoyed with his family members. Further, some of the affidavits describe the manifestations of Thomas's mental illness, including his severe mood swings and inability to distinguish the imaginary from reality. *See generally* Ex. D; Ex. H of Suppl. Filing. All of this testimony would have been pertinent to a mitigation case. *See* 42 Pa. C.S. § 9711(e)(2), (3), and (8) (listing, respectively, as mitigating factors, "[that] the defendant was under the influence of extreme mental or emotional disturbance," "[that] [t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired," and "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense."). More importantly, counsel was aware of some of Thomas's own actions indicating questionable mental health, not the least of which were Thomas's post-arrest suicide attempt and statements by Thomas that he wanted to die. But, despite this knowledge, counsel failed to assemble the substantial, documented, record of Thomas's history of mental problems, and failed to even go so far as obtaining his own mental health examination of his client. *See Rompilla,* 125 S.Ct. at 2463. As *Jacobs* and *Rompilla* suggest, given the stakes of this case and the availability of information should counsel have sought it, the failure to do so amounts to a failure to exercise reasonable judgment.

It is true that in *Rompilla,* not only were the records counsel failed to discover publicly available, but the prosecution had specifically notified defense counsel that it was going to use these particular records as part of its case at sentencing. In the instant case, the mental health evidence Thomas's counsel might have presented was not in direct response to anything the prosecution had planned to introduce, and the information was not as easily accessible (i.e., in a public file in the same building as the current trial) as was the information concerning Rompilla's past convictions. In addition, Thomas was not simply uncooperative with counsel—he expressly told counsel that he did not wish to present mitigating evidence. However, Thomas's counsel was nonetheless aware of the prosecution's intention to argue the existence of several aggravating factors, and thus of the need to respond in order for there to be any hope of avoiding a death sentence. All of the pertinent information, including a series of mental health evaluations and a statement following Thomas's suicide attempt while in custody, was readily available for counsel to discover with minimal effort. And, as discussed in section D, *infra,* Thomas was never adequately informed and thus was not truly aware of what he was foregoing by choosing not to present such evidence. Under the circumstances, any

Schizoid traits." Report of Lawrence Byrne, Ex. K at 4.

waiver of the right to present mitigating evidence was not made knowingly.

It is against this background that we must assess trial counsel's duty, using the controlling professional standards of the time as a guide to evaluating the reasonableness of counsel's actions. In addition to the text quoted at page 29, *supra,* the commentary accompanying the ABA Standards for Criminal Justice identifies the principles underlying the duty to investigate.

> The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, *mental and emotional stability,* family relationships, and the like, will be relevant.... *Investigation is essential to fulfillment of these functions.* ... The effectiveness of advocacy is not to be measured solely by what the lawyer does at the trial; *without careful preparation, the lawyer cannot fulfill the advocate's role.*

Commentary, 1 ABA Standards for Criminal Justice 4–4.1 (2d ed.1980) (emphasis added). Here counsel's deficient performance was not due to any pursuit of a particular trial strategy—there was simply no investigation at all, and thus no foundation on which to base any strategic choice. *See United States v. Gray,* 878 F.2d 702, 711 (3d Cir.1989) ("counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."); *Blystone v. Horn,* No. 99–490, slip op. at 120 (W.D.Pa. March 31, 2005) ("trial counsel's failure to obtain records

from [defendant's] background or request expert mental health assistance was not based on any tactical decision. Rather, it resulted from his inadequate preparation.").

Although the circumstances of every case might not call for a thorough investigation in all respects, if counsel chooses not to investigate certain matters, he must at least "make a reasonable decision that makes particular investigation unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. A ruling by Judge Van Antwerpen, while still a member of this court, helps to illuminate how such a decision should be evaluated.

> Because the post-trial evaluations show that mental health evidence existed prior to trial, both a complete failure to investigate and a partial investigation that failed to uncover such evidence must be considered unreasonable because counsel probably would have discovered such evidence had his investigation been reasonable.... Likewise, because such evidence probably would have been discovered, counsel's decision not to make such an investigation, if indeed he made such a decision, must be considered unreasonable.

*Holloway v. Horn,* 161 F.Supp.2d 452, 567–68 (E.D.Pa.2001), *rev'd on other grounds,* 355 F.3d 707 (3d Cir.2004). The fact that Thomas may have directed counsel not to present mitigating evidence, even assuming, *arguendo,* that such direction was made knowingly (but see section D, *infra* ), does not render reasonable counsel's decision not to investigate. As ABA guidelines indicate, "The investigation for preparation of the sentencing phase should be conducted *regardless of any initial assertion by the client that mitigation is not to be offered."* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty

Cases, Guideline 11.4.1(C) (emphasis added).

Thus, while " '[t]he right to counsel does not require that a criminal defense attorney leave no stone and no witness unpursued[,]' the Sixth Amendment 'does require a reasoned judgment as to the amount of investigation the particular circumstances of a given case require.' " *Blystone,* slip op. at 121 (quoting *Jermyn v. Horn,* 266 F.3d 257, 308 (3d Cir.2001)). As the case law and the controlling ABA standards indicate, effective representation necessitates not only the investigation of potentially mitigating evidence, but also the presentation of such evidence, particularly to rebut aggravating evidence presented by the prosecution. *See Rompilla,* 125 S.Ct. at 2465–2466. The Commonwealth argues that the silence of the record renders Thomas's ineffective assistance claim groundless, as Thomas cannot prove that his counsel did not investigate. While it is true that the record here is devoid of any affidavit or other recital by trial counsel of his particular efforts (or lack thereof), there is also nothing in the record to indicate that any investigation or independent mental health evaluation did occur—a notable omission, given the paper trail or other on-the-record indication(s) such investigation would be likely to leave behind. More importantly, even if one assumes, *arguendo,* that counsel did investigate and discover the available mental health evidence, his failure to present such evidence or at least to use such evidence as the basis for obtaining the defense's own mental health evaluation constitutes an independent basis for a finding of deficient performance.

Given the prevailing professional standards, trial counsel's failure to investigate and/or present the available mental health records and evaluations, along with counsel's failure to obtain and present any independent mental health evaluation or examination, constituted deficient performance.[15] The next step of the *Strickland* inquiry is to determine whether counsel's deficient performance prejudiced Thomas.

**B.**

To establish prejudice under *Strickland,* a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. 2052. However, *Strickland* does emphasize the "strong presumption of reliability" of the criminal process. 466 U.S. at 696, 104 S.Ct. 2052. A court should only be concerned with "whether . . . the result of the particular proceeding is unreliable because of a breakdown in the adversarial process." *Id.* A "verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.*

Specifically, a defendant does not need to show that it is more likely than not that counsel's deficiencies altered the outcome of the trial. *See Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Hull v. Kyler,* 190 F.3d 88, 110 (3d Cir.1999) ("This standard is not a stringent

---

**15.** The Commonwealth suggests there is not enough evidence in the record to determine whether counsel was truly ineffective, and that, furthermore, this court is precluded from holding an evidentiary hearing to determine additional facts. Because the evidence on the record is sufficient to demonstrate a Sixth Amendment violation, there is no need to hold an evidentiary hearing. It is therefore unnecessary for this court to decide whether such a hearing is available under the AEDPA and the controlling case law.

one. It is less demanding than the preponderance standard."). In applying this standard, it is important to take into account whether the state requires unanimity for conviction and/or imposition of the death penalty, as this might further influence precisely what is necessary to demonstrate prejudice. *See Hendricks,* 307 F.3d at 103.

Here we have a case where the jury unanimously found three aggravating factors—commission of a murder during a felony, a significant history of felony convictions, and commission of murder by means of torture. In light of these factors, as well as the mountain of evidence of Thomas's guilt and the extremely brutal nature of his crime, it is possible that the introduction of evidence of Thomas's mental health might have had little or no effect on the jurors' sentencing decision. However, the absence of such evidence made it impossible for the jury to assess whether Thomas was "under the influence of extreme mental or emotional distress" or was "unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law," two of the several potential mitigating factors the jury could find. *See* Petitioner's Exhibit O, First Degree Murder Verdict: Penalty Determination Sheet.

While one cannot, of course, know what effect the undiscovered evidence of Thomas's mental history would have had on the jury had counsel gathered and presented the evidence, it is reasonably probable that, for a single juror, such evidence could have been powerful enough to affect his or her sentencing decision. *See Wiggins,* 539 U.S. at 534, 123 S.Ct. 2527. The Third Circuit recently addressed this issue in *Jermyn,* in which the jury imposed a sentence of death after finding that the one aggravating factor proved by the prosecution outweighed three mitigating factors. Because of the delicate weighing of evidence the jury employed, the court there held that the failure of counsel to present additional evidence bolstering these mitigating factors was prejudicial. 266 F.3d at 309. "Because the jury's decision must be unanimous, [defendant] can show prejudice in this case if there is a reasonable probability that the presentation of the [evidence] ... would have convinced one juror to find the mitigating factors to outweigh the single aggravating factor the Commonwealth relied upon in this case." *Id.* Although in Thomas's case there were three serious aggravating factors presented to the jury, rather than one, Thomas's jury heard no mitigating evidence at all, and thus was left with little choice but to find the aggravating factors controlling and to impose a sentence of death. Thus, there is a reasonable probability that at least one juror would have decided that Thomas's mental condition constituted sufficient mitigation to render the death penalty improper.

As the Supreme Court recently explained in *Penry v. Lynaugh,* " 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse.' " 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (quoting *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring)). The extensive evidence available suggesting that Thomas was suffering from paranoid schizophrenia and other mental conditions, along with evidence of his suicide attempt and the background information that Thomas's family members could have provided, "might well have influenced the jury's appraisal of his moral culpability." *Williams,* 529 U.S. at 398,

120 S.Ct. 1495.[16] As another court in this circuit recently explained, "[i]n case after case, federal courts have found prejudice when counsel fails to investigate, develop, or introduce mitigating evidence that is similar to the evidence in [defendant's] case. This case is no different." *Pursell v. Horn*, 187 F.Supp.2d 260, 387 (W.D.Pa. 2002) (citing *Williams*, 529 U.S. at 397–98, 120 S.Ct. 1495; *Jermyn*, 266 F.3d at 257). As in *Pursell* and many other cases, while the potentially mitigating evidence at issue might not have swayed every juror, or even a majority of jurors, Thomas must only show a reasonable probability that one juror would have found death an inappropriate punishment. 187 F.Supp.2d at 386; *see also Jermyn*, 266 F.3d at 309. Thomas has successfully met this burden, and so counsel's failure to present—or even investigate—this evidence meets the *Strickland* standard of prejudice.

## C.

Because counsel failed to present any evidence in mitigation, Thomas's chance to escape the death penalty became especially contingent upon counsel's penalty phase closing argument. Sadly, that performance was grossly deficient: counsel's closing argument was largely incoherent, and portions of it that could be said to have a semblance of coherence served only to underscore the tragic fact of Johnson's death:

> Now, whatever the Commonwealth has tried to structure for you, and I am not being facetious when I say it, I point out that Miss Johnson is dead. The Commonwealth would have you look for a

practical point that this was done, that was done, albeit it was done.

> Now, the question is Miss Johnson is dead. . . . I only ask that you insofar as as [sic] determining your verdict take your time as to what your verdict may be. . . . I don't know if I am using the correct word when I say verdict, sentence, your verdict has been entered.

N.T.2/6/86 at 6.53–54.

Other portions of the sentencing closing invited the jury to consider factors irrelevant to their sentencing deliberations, and reflected serious misunderstanding of the nature of the legal principles and proceedings in play. For example, defense counsel argued that there was insufficient evidence to convict Thomas of rape even though the jury had, by that point in the proceedings, already rendered a guilty verdict on the rape charge. *Id.* at 6.52. Similarly, in attempting to rebut the prosecution's prior violent criminal history aggravator, counsel not only made an implausible, speculative argument about the possible existence of a "different" Brian Thomas, but he also led the jury away from its proper consideration of whether Thomas had a significant history of *violent* felony convictions to consider instead whether he had a "significant history of felony convictions," without any regard for their violent or non-violent nature. *Id.* at 6.54–55.

As lamentable as these discrete errors or misstatements may be, they pale in comparison to the impression left by a reading of the closing argument in toto:

---

**16.** The Commonwealth suggests that this additional evidence might actually have hurt Thomas's case, as it would have opened the door to further jury consideration of Thomas's past criminal acts. This argument is unpersuasive, however, as the jury was already well aware of at least two of Thomas's past convictions—for the sexual assault of a three-year-old boy, and for criminal trespass, in which he entered the home and climbed into the bed of a sleeping woman. Given that the jury had already found that the prosecution had sufficiently proven the existence of past felonious behavior as an aggravating factor, it seems improbable that additional information concerning Thomas's past convictions and serious mental instability would have further harmed Thomas's case.

With the Court's permission, ladies and gentlemen of the jury, having arrived at a verdict, you are now on the penalty stage in which you are the determiners of that.

One thing, during the case in chief I might want to point out notwithstanding your returning verdict as you have, I still would like to point out the factor that maybe there may not be there which seems to come about by virtue of you asking a particular question. That is the particular situation concerning the rape charge. Now, be that as it may, we thought in terms it wouldn't be necessary to explain to you what is meant by sexual intercourse, but, of course, if you find your conclusion were predicated upon remote sperm, that's one thing.

That was however, if you are dealing with the situation I don't recall any particular testimony, expertwise or medical testimony or anything else, that may give rise to someone having sexual intercourse or for that matter involuntary sexual deviate conduct or act.

Your verdict is there, but I still point that phase out to you that there was no indication of the usual sexual intercourse definition in which it would be necessary to find that there was an insertion of a penis. That came to whatever came to.

In dealing—what you are dealing with you have a situation where you have to determine whether or not it would be the imposition of the death penalty or life in this matter.

Now, whatever the Commonwealth has tried to structure for you, and I am not being facetious when I say it, I point out that Miss Johnson is dead. The Commonwealth would have you look for a practical point that this was done, that was done, albeit it was done.

Now, the question is Miss Johnson is dead. You will be instructed by the Court on the limitations insofar as the imposition of the death penalty, when it can occur, under what circumstances, and how are you to evaluate that.

Now, with regard to the particular matter that you have heard, I point out that how do you approach this phase of it, I will underscore and ask you to do the same as I asked you to do in the case in chief or the case itself. Again with regard to this, you have to evaluate it, you have to determine what your position is and determine what your verdict will be.

I only ask that you insofar as as [sic] determining your verdict take your time as to what your verdict may be, also having arrived at your decision in good conscience, whatever it may be, to stand by that verdict. I don't know if I am using the correct word when I say verdict, sentence, your verdict has been entered.

With regard to the matters of prior record of Mr. Thomas, I submit to you, ladies and gentlemen, you have a 1977 or 1978 guilty plea situation with regard to Mr. Thomas.

As to the 1984 situation, you have a Brian Thomas. It has not been demonstrated to you that he is the one.

Aside from that, you will find that the Court will instruct you that it will be necessary that you find a significant history of felony convictions. I will leave it to the Court to explain what is meant by significant history, take them one at a time, felony convictions, plural. So there is a standard, there is a test that you must evaluate and you must apply, but under the circumstances that you have had in listening to this case, I harken to you that it is a situation in which a death has occurred. It's a situation that you have spoken of.

On behalf of Brian Thomas I would ask that you consider very strongly in

your sentence to consider the imposition of the death penalty. Thank you, ladies and gentlemen—the non-imposition of the death penalty, and bring back a verdict or a sentence of life imprisonment.

N.T.2/6/86 at 6.51–55.

In sum, counsel's closing was, at best, incoherent and, at worst, in the service of the prosecution's contention that the jury should select death rather than life imprisonment. Counsel wholly failed in his duty to present a closing argument helpful to Thomas. Instead, counsel's closing, whose importance was heightened in the absence of any mitigating evidence, gravely prejudiced his client.

### D.

■ The Commonwealth argues that any assertable deficiency of defense counsel in investigating possible lines of a mitigation defense at the sentencing phase cannot constitute a cognizable instance of ineffective assistance of counsel for the reason that Thomas directed counsel not to argue in mitigation. Thomas does not deny that he so advised counsel, and the record reflects that Thomas, in colloquy, even expressed such a desire to the trial judge. But while "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052, not every such waiver is constitutionally valid.

As the Supreme Court made plain more than sixty years ago, "[a] waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver ... must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct.

1019, 82 L.Ed. 1461 (1938). The Court has examined this requirement in several contexts, most notably with respect to a defendant's guilty plea. *See, e.g., North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) ("The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."); *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969) (waiver in the context of a guilty plea "cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts."). In its discussion of the waiver of the right to counsel, the Court has used similar language in terms of the knowledge required.

> To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.

*Von Moltke v. Gillies,* 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948); *see also* Pa. R.Crim. P. 121(c) (requiring a "knowing, voluntary, and intelligent waiver of counsel"). As the Court recently explained, "The purpose of the 'knowing and voluntary' inquiry ... is to determine whether the defendant actually [understands] the significance and consequences of a particular decision[.]" *Godinez v. Moran,* 509 U.S. 389, 401 n. 12, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993).

Courts have extended this standard to waivers of the right to present mitigating evidence, *see, e.g., Wilkins v. Bowersox,* 145 F.3d 1006, 1015–1016 (8th Cir.1998), and it is clear that such a waiver cannot be knowingly and intelligently made in the

absence of full information about the nature of one's choices. "First, counsel's duty to investigate reasonably and inform and advise his client must be fulfilled before either the lawyer or his client can decide what evidence to present; *if counsel failed to investigate and advise, then Petitioner's waiver was not knowing and intelligent and thus without legal effect.*" *Holloway,* 161 F.Supp.2d at 569 (emphasis added), *rev'd on other grounds,* 355 F.3d 707 (3d Cir.2004). As the Third Circuit has squarely held, the absence of an informed decision vitiates an otherwise valid waiver. *See United States v. Gray,* 878 F.2d at 712. The court in *Gray* expressly held that a defendant's reluctance to subpoena witnesses could not act as a waiver of his right to have those witnesses testify, as this reluctance was based on inaccurate information-counsel did not know, and therefore failed to inform the defendant, that subpoenaed witnesses were entitled to compensation for their expenses. *Id.* "This therefore is not a case in which the defendant made an informed decision which precluded counsel from having a duty to pursue a given line of investigation." *Id.*

Indeed, as several courts have suggested, the failure to investigate itself precludes a knowing waiver, as there will always be uninformed decisions in such cases. *See, e.g., Blanco v. Singletary,* 943 F.2d 1477, 1500–03 (11th Cir.1991) (counsel's failure to talk to potential mitigation witnesses and to investigate defendant's mental health status resulted in an unknowing, involuntary waiver, as without knowing what evidence defendant was foregoing, counsel "could not have advised [him] fully as to the consequences of his choice not to put on any mitigation evidence"). A defendant's desire not to present mitigating evidence, therefore, cannot by itself terminate counsel's duty to investigate. Indeed, "[t]he reason lawyers may not 'blindly follow' such commands is that

although the decision whether to use such evidence is for the client, the lawyer first must evaluate potential avenues and advise the client of those offering potential merit." *Thompson v. Wainwright,* 787 F.2d 1447, 1451 (11th Cir.1986). *See also Battenfield v. Gibson,* 236 F.3d 1215, 1227–35 (10th Cir.2001) (because counsel failed to conduct a reasonable investigation for possible mitigating evidence, he could not competently advise the defendant as to the meaning, nature, and availability of such evidence; therefore, the defendant's waiver was not knowing and intelligent); *Coleman v. Mitchell,* 268 F.3d 417, 449–50 (6th Cir.2001) (for the refusal to present mitigating mental health evidence to be an informed one, counsel must fulfill its independent obligation to investigate despite a defendant's expressed wishes to the contrary); *Matthews v. Evatt,* 105 F.3d 907, 920 (4th Cir.1997) ("counsel has the obligation to conduct a reasonable investigation even if the defendant is reluctant to cooperate"); *Weekley v. Jones,* 76 F.3d 1459, 1466 (8th Cir.1996) ("an attorney may [not] blindly follow a client's uncounselled wishes").

In the instant case, the evidence is compelling that Thomas's decision not to present mitigating evidence was not an informed one. His counsel never made clear to him the gravity of his decision not to present mitigating evidence, and it is apparent that Thomas did not understand the nature of the penalty phase hearing. As Thomas stated in his affidavit prepared in support of his petition, he "did not then understand that I could present evidence concerning my character as a mitigating circumstance during the penalty phase. I was under the belief that I could only present evidence relating to the circumstances of the offense." Affidavit of Brian Thomas, Exhibit F. Although the trial court, in colloquy, attempted to make clear the consequences of Thomas's decision not

to present mitigating evidence, the transcript does not indicate that Thomas truly understood the type of information he could present and the way in which such evidence could factor into sentencing. In particular, it was not made clear to Thomas, either by the trial court or by counsel, how this stage of the trial materially differed from the guilt phase:

[Defense Counsel]: Mr. Thomas, you recall during the case in chief we inquired as to whether or not you wanted to testify in your own behalf. Do you recall that?

THE DEFENDANT: Yeah, I do. Why do I answer all these questions before? We done be over that already. No, I don't want to get on the stand.

THE COURT: Well, this is a different portion.

THE DEFENDANT: I still don't want to get on the stand.

THE COURT: Under no condition?

THE DEFENDANT: No.

THE COURT: This is your own decision?

THE DEFENDANT: Yes it is.

THE COURT: Did you discuss it with your lawyer, Mr. Watson?

THE DEFENDANT: Yes.

THE COURT: And you already told him, I would like to repeat, but it's your decision not to take the stand at this penalty stage of the hearing or even to present any evidence. Is that your independent and voluntary decision?

THE DEFENDANT: It is.

THE COURT: Any promises or threats been made to you to induce you to take that position?

THE DEFENDANT: No.

THE COURT: Now, let me point out to you that this is an extremely serious matter to you. The jury may return a verdict of death in the electric chair if they find certain matters have occurred. On the other hand, they may come back in with a verdict of life imprisonment. Now, having told you this, the importance of this decision of yours should be very clear to you. Is it?

THE DEFENDANT: Yeah, it is.

THE COURT: Where are you right now, this very moment?

THE DEFENDANT: In City Hall.

THE COURT: Do you know the courtroom?

THE DEFENDANT: 654.

THE COURT: Have you taken any drugs or anything within the last 24 hours?

THE DEFENDANT: No.

THE COURT: Are you satisfied with the representation of you by Mr. Watson so far?

THE DEFENDANT: I am.

[The prosecutor]: May I ask two questions?

THE COURT: Yes.

Q.: Mr. Thomas, do you have any witnesses that you would like to call at this time at this stage at this proceeding?

A.: No.

Q.: Are you sure about that?

A.: No.

[Defense counsel]: No, no, I only asked him one time. Why keep asking the same question?

THE COURT: You mean no, you don't have any witnesses to call?

THE DEFENDANT: Right.

[The prosecutor]: Q. There is no witness in existence you would like to call, sir, at this time. Yes or no?

A.: I said no.

[The prosecutor]: Thank you. I am satisfied, Your Honor.

THE COURT: All right, bring the jury back.

Because the nature of the proceeding was not adequately explained to Thomas, he could not possibly have had full knowledge of what he was waiving when he instructed counsel that he did not wish to present mitigating evidence. As such, his waiver was not made knowingly, voluntarily, and intelligently, and therefore must be considered invalid. Counsel had a duty to investigate that was independent of any expressed reluctance of Thomas. Only after such an investigation would counsel have been in a position to advise Thomas of all the avenues available to him, explain to him the nature of the proceeding, and then be guided by his client's informed decision. The duty to investigate is well established, and it cannot be overcome by the misguided instructions of an uninformed client.

Thomas's asserted waiver of the right to present mitigating evidence was uninformed and hence ineffective. Therefore, it could not cure the *Strickland* deficiency canvassed above. In sum, Thomas was denied his Sixth Amendment right to effective counsel at the penalty phase of his trial, and is therefore entitled to a new sentencing hearing.

### Claim III—Denial of effective assistance of counsel

Invoking *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), Thomas argues that defense counsel's assistance at the penalty phase was *per se* ineffective given counsel's failure to adduce any mitigating evidence, to agree to a stipulation that would have allowed the jury to consider Thomas's age and high school diploma as mitigating factors, and to render a coherent closing argument.

In contrast with *Strickland*, which requires a showing of prejudice, *see* 466 U.S. at 694, 104 S.Ct. 2052, in *Cronic*, the Supreme Court has identified three situations implicating the right to counsel that involved circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658–659, 104 S.Ct. 2039. Relevant here is the situation where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," *id.* at 659, 104 S.Ct. 2039, which results in a "denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable," *id.* Thomas argues that counsel's failure to mount any defense during the penalty phase effectively deprived him of counsel altogether, thereby presumptively establishing prejudice.

There is certainly much to lament in defense counsel's penalty phase performance. Nonetheless, the court need not reach the issue of whether counsel was ineffective *per se* in light of the court's finding, under Claims I and II, that counsel's performance met the *Strickland* standard for ineffectiveness. Thus, Thomas would not benefit from further relief even if the court were to find in his favor on Claim III. Accordingly, this claim will be dismissed without prejudice.[17]

17. The court notes, however, that counsel did deliver a closing argument (however inadequate it was), seek to cross-examine the prosecution's penalty-phase witnesses, and move to have the court impose, as a matter of law, a sentence of life imprisonment on the basis of various alleged improprieties (e.g., that the jury should have been life qualified in addition to death qualified; that the prosecution should not have invoked the victim's pain and suffering in its closing at the guilt phase). Thus, counsel's failures were likely not sufficiently global to place Thomas's case within the *Cronic* presumption, which applies only to those instances when the "attorney's failure [was] complete," *Bell v. Cone*, 535 U.S. 685, 697, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

*Claim IV—Trial court's failure to order a competency evaluation at sentencing*

Thomas contends he was denied due process by the trial court's failure to *sua sponte* order a hearing regarding his competency to waive his right to present mitigating evidence, after it had received a copy of the presentence report indicating Thomas's questionable mental health. In addition, Thomas contends trial counsel was deficient for failing to request such a hearing or otherwise raise the matter at sentencing.

While it is true that "due process requires that the trial court inquire *sua sponte* into the defendant's competence if there is reason to doubt it," *United States v. DiGilio,* 538 F.2d 972, 987 (3d Cir.1976), Thomas's argument that the presentence report provided such reason for doubt is belied by the report itself. Lawrence Byrne, the psychologist who conducted a court-ordered evaluation as part of the presentence report, found Thomas to be competent. Assuming, *arguendo,* that Thomas was entitled to a court-ordered investigation into his competency, this entitlement was satisfied by Byrne's evaluation. As the Commonwealth persuasively notes, "[s]urely the court was not supposed to keep sending [Thomas] back until the psychologist concluded otherwise." Response to Petition, at 62.

Since Thomas did not have a right to another competency evaluation, counsel cannot have been deficient for failing to raise the issue at trial.[18]

*Claim V—Defense not provided a copy of the presentence report*

■ Noting that the trial court record does not indicate whether or not trial counsel ever received a copy of the presentence investigation (PSI) report, Thomas speculates that his counsel may not have received the report. That report contained Lawrence Byrne's court-ordered psychological evaluation of Thomas, and stated that Thomas suffered from "Severe Multiple Personality Disorders," as well as "Sociopathic, Reactive Paranoid, and Schizoid Traits." Pet. Ex. K. at 4. Further, Byrne found that Thomas exhibited "a great deal of underlying psychopathology which is clearly focused in the sexual area, with indication of ... very primitive, brittle and inadequate controls." *Id.* Thomas argues that the PSI report would have been invaluable to his counsel since it called into question his ability to waive mitigating evidence and, indeed, to be prosecuted at all. Because due process forbids a court from imposing the death sentence, "at least in part, on the basis of information which he had no opportunity to deny or explain," *Gardner v. Florida,* 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), Thomas contends that his due process rights were violated if his counsel was not given the PSI report. *See also Commonwealth v. Martin,* 466 Pa. 118, 351 A.2d 650, 657 (1976) ("if the court orders a presentence report, defense counsel has a right to examine its contents before sentencing and, if he contests any portion, to offer evidence in rebuttal.").

Of course, as Thomas acknowledges, the claim of a due process violation is speculative, and will remain so until it is known whether defense counsel received the PSI report. Thomas thus requests an evidentiary hearing on this issue. The Commonwealth contends that 28 U.S.C.

---

**18.** Thomas raises an ineffectiveness of counsel argument as a corollary to nearly all of the substantive claims in his petition. Because none of the claims he raises, with the exception of Claims I and II, are valid claims of error, the ineffective assistance claims that hereinafter appear as part of his substantive claims are similarly denied. In each instance where there is no substantive right or violation at issue, counsel cannot be found deficient for failing to advance a meritless argument.

§ 2254(e)(2) forbids such a hearing. That section provides that "[i]f the [habeas] applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—(A) the claim relies on—(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

The Supreme Court has stated, however, that the conditions imposed by § 2254(e)(2) apply *only* to the habeas petitioner who is "at fault for the deficiency in the state-court record." *Williams v. Taylor*, 529 U.S. 420, 433, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). By contrast, said the Court in *Williams*, "[i]f there has been no lack of diligence at the relevant stages in the state proceedings, the prisoner has not 'failed to develop' the facts under § 2254(e)(2)'s opening clause, and he will be excused from showing compliance with the balance of the subsection's requirements." *Id.* at 437, 120 S.Ct. 1479.

The *Williams* habeas petitioner was found by the Court not to have exercised the diligence required to preserve the claim that nondisclosure of a psychiatric report evaluating Williams's co-defendant was in contravention of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). While the report had been prepared before Williams's trial, and was found in his file when it was reviewed by counsel for his federal habeas petition, the issue was first raised in Williams's federal habeas petition, and Williams's

state habeas counsel later averred that he did not recall seeing the report at the time that he reviewed Williams's file to prepare for Williams's state habeas case. The Court rejected this explanation, noting that "[t]here [were] repeated references to a 'psychiatric' or 'mental health' report in a transcript of [the co-defendant's] sentencing proceeding, a copy of which petitioner's own state habeas counsel attached to the state habeas petition he filed with the Virginia Supreme Court." 529 U.S. at 438, 120 S.Ct. 1479.

Counsel for Thomas's direct appeal and initial PCRA filings were in much the same position as Williams's state habeas counsel. The transcript of Thomas's sentencing proceeding shows that the court ordered a "pre-sentence evaluation and also a psychiatric [evaluation]" in anticipation of the post-trial motions. N.T. 2/7/86 at 11. Further, it is routine for Pennsylvania trial judges hearing death penalty cases to order a pre-sentence report. *See, e.g., Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52 (2003); *Commonwealth v. Markley*, 348 Pa.Super. 194, 501 A.2d 1137, 1143 (1985); *Commonwealth v. Shoemaker*, 226 Pa.Super. 203, 313 A.2d 342 (1973). It is thus difficult to suppose that Thomas's direct appeal or initial PCRA counsel would not have known about the existence of the pre-sentence report. And, once apprised of the report's contents, these later counsel should have sought to determine why trial counsel neglected to rebut it.

Like the petitioner in *Williams*, then, Thomas cannot be said to have exercised the diligence that would entitle him to bypass the strictures of § 2254(e)(2). Nor can Thomas establish grounds for the nonapplicability of these strictures. As noted above, when a habeas petitioner has failed to develop the factual basis of a claim in state court, a federal court may grant an evidentiary hearing only if "the facts un-

derlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." § 2254(e)(2)(B). Here, then, Thomas would have to demonstrate by clear and convincing evidence that the judge would have rejected the jury's imposition of death if trial counsel had received the report. This, in turn, requires that Thomas demonstrate by clear and convincing evidence that trial counsel could have successfully rebutted Byrne's competency evaluation. Thomas does not attempt to make such a showing, and the record does not indicate that such a showing could be made. Accordingly, Thomas's request for an evidentiary hearing on this issue must be denied.

*Claim VI—Vague, overbroad, and erroneous torture instruction*

■ With respect to the trial judge's instructions at the penalty phase regarding torture as an aggravator, Thomas contends the judge's use of "unnecessarily heinous, atrocious, or cruel" in his description of torture renders the instruction unconstitutionally vague. The torture instruction, in its entirety, defined torture as "the intentional infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious or cruel manifesting exceptional depravity." N.T. 6.52, Feb. 7, 1986.

Thomas is correct that the Eighth Amendment requires that aggravating circumstances be defined with sufficient precision to ensure that the sentencer is provided with clear and objective standards that provide specific guidance, thereby avoiding an exercise of discretion that would render imposition of the death penalty arbitrary or capricious. *See, e.g., Espinosa v. Florida,* 505 U.S. 1079, 1081, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992) ("an aggravating circumstance is invalid

... if its description is so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor."); *Maynard v. Cartwright,* 486 U.S. 356, 361–362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (instructions must not leave juries and appellate courts with open-ended discretion). And, more specifically, Thomas invokes Supreme Court authority holding that an aggravating circumstance so described is unconstitutionally vague. *See, e.g., Maynard,* 486 U.S. at 361–64, 108 S.Ct. 1853 ("especially heinous, atrocious, or cruel" aggravator). *Cf. Espinosa,* 505 U.S. at 1081, 112 S.Ct. 2926 ("wicked, evil, atrocious, or cruel"); *Clemons v. Mississippi,* 494 U.S. 738, 741, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (same).

But while Thomas argues that the judge's instruction in his trial is rendered unconstitutionally vague by the use of the phrase "unnecessarily heinous, atrocious or cruel," in each of the cases in which the Supreme Court found that phrase (or a similar phrase) to be unconstitutional, the phrase comprised the entire definition of the aggravating factor at issue. In Thomas's case, the phrase was embedded in a definition that contained additional descriptors and other qualifiers—qualifiers that allowed for the "aggravating circumstance[ to] be construed to permit the sentencer to make a principled distinction between those who deserve the death penalty and those who do not." *Lewis v. Jeffers,* 497 U.S. 764, 776, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

Taken in its proper context, the trial judge's definition of torture was "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action" *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Thus, the instruction does not violate any

constitutional standard, and Thomas is not entitled to relief on this claim.

### Claim VII—Prosecutorial misconduct during the guilt phase

Thomas contends that certain statements made by the prosecutor during the guilt phase of the trial amounted to misconduct in violation of the due process and confrontation clauses[19]. Specifically, Thomas contends that the prosecutor, during his closing argument, referenced his thirteen years of experience and his litigation of 250–300 cases and, in this way, implied that the jury should reach its decision on the basis of the prosecutor's vast experience, rather than on the existence or absence of sufficient evidence. In addition, Thomas argues that the prosecutor's passing reference to a potential penalty phase undermined the right to a bifurcated trial afforded under state law in capital cases. Finally, the prosecutor speculated, in his closing, about the victim's pain and suffering as a result of Thomas's sexual assault, which Thomas argues inflamed the passions of the jury, who would thus convict Thomas on the basis of the victim's pain and suffering, rather than on the existence of proof beyond a reasonable doubt.

■■ While it is true that "prosecutorial misconduct may so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process," *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (internal quotation omitted), this does not mean that a federal habeas court reviewing a state court conviction and sentence has authority to set as constitutional benchmarks the norms of prosecutorial conduct that would be expected to be observed in a federal trial and sentencing. "[T]he appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (internal citations omitted). In *Darden*, the Court held that a series of inflammatory statements by the prosecution did not amount to a due process violation where the statements were responsive to defendant's closing; where the judge had instructed the jury that it was to consider only the evidence, and not the parties' arguments; and where the evidence against the petitioner was very strong. *Id.* at 182–83, 106 S.Ct. 2464.

■ In Thomas's case, as in *Darden*, the prosecution's statements about his experience were made in the context of a response to the defendant's closing. Addressing a statement by defense counsel that the jury should not convict Thomas because the Commonwealth had not presented fingerprint evidence, the prosecutor called upon his experience to point out that, in all of his years trying criminal cases, there had been only five at which fingerprint evidence had played a role. In addition, the judge specifically instructed the jury to base its decision on the evidence, not on the parties' arguments. Finally, the evidence against Thomas was

19. The Commonwealth construes Thomas's claim as a due process violation, responding to the several cases Thomas cites that similarly construe such claims. However, in his reply, Thomas responds that the alleged misconduct was, in fact, a violation of the confrontation clause. For the sake of clarity, both of these arguments will be addressed below. Thomas also makes passing reference to an Eighth Amendment violation, but as he does not make a developed argument based on Eighth Amendment grounds, it is unnecessary to conduct a protracted analysis of this claim. For the reasons Thomas's due process and confrontation clause arguments will be rejected, so will any potential Eighth Amendment argument.

extremely weighty—sufficient to diminish the inflammatory effect of the prosecution's remarks concerning pain and suffering, even assuming, *arguendo*, that these remarks were improper. Regarding the prosecutor's passing reference to the penalty phase, the Commonwealth is correct that there is no constitutional obligation to keep the possibility of a penalty phase a secret from the jury, and nothing about the prosecutor's statement contravened Thomas's right to a bifurcated trial. In short, not only is there merit to the Commonwealth's arguments that the prosecutor's statements were not inappropriate, given the context, but Thomas is unable to demonstrate prejudice that materially affected the fairness of the trial.

Turning to Thomas's confrontation clause claim, Thomas contends the prosecutor's statements about his own past experience and about the pain and suffering of Linda Johnson placed before the jury facts not in evidence and not subject to confrontation. However, the standard for confrontation clause violations requires a showing of prejudice, and Thomas has made no such showing. *See, e.g., Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (holding that confrontation clause errors are subject to a harmless error analysis, which includes a required showing of prejudice) (1986); *Douglas v. Alabama,* 380 U.S. 415, 420, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) (finding a confrontation clause violation where the defendant's inability to conduct a cross-examination of a witness "unfairly prejudiced the defendant"); *United States v. Chandler,* 326 F.3d 210, 219 (3d Cir.2003) ("Confrontation Clause claims ... should be considered in relation to the potential effect of the foreclosed cross-examination"). As the Commonwealth persuasively argues, given the context of the alleged inappropriate statements (i.e., they were responsive to defendant's closing, the judge instructed the jury to consider only

the evidence, and the evidence of guilt was so massive), even if Thomas could show them to be inappropriate, they would not have served to inject significant prejudice into the proceedings, or to have otherwise "infected the proceeding with unfairness." *Greer,* 483 U.S. at 765, 107 S.Ct. 3102.

For these reasons, Thomas has failed to establish any constitutional violation stemming from the prosecutor's remarks at the guilt phase, and therefore he is not entitled to relief on this claim.

### *Claim VIII—Prosecutorial misconduct during the penalty phase*

Thomas alleges similar instances of prosecutorial misconduct during the penalty phase. Specifically, Thomas contends the prosecutor failed to limit his statements to a discussion of aggravating and mitigating evidence, when he 1) referred to his experience and to both his and the jurors' oaths, thereby inviting the jury to rely on his experience and implying that the jurors' oath compelled them to impose the death penalty; 2) implied that Thomas's future dangerousness could be quashed only by imposition of the death penalty, thereby materially misstating the law because future dangerousness is not a statutory aggravating factor in Pennsylvania and because Thomas was statutorily ineligible for parole; and 3) inappropriately invoked the Bible to support his statements about the sanctity of the home.

As discussed in relation to Claim VII, a prosecutor's statements rise to the level of a constitutional violation only if, based upon "an examination of the entire proceedings," it is clear that the prosecution's statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *see also Darden,* 477 U.S. at 181–82, 106 S.Ct. 2464. The Commonwealth is correct that the

prosecution's statements, taken either individually or together, were not sufficiently egregious to meet this standard. While the prosecutor did refer to his experience, he was not asking the jury to rely on his authority, and his invocation of his and the jurors' oaths did not imply that only a sentence of death would comport with those oaths.[20] The prosecutor asked only that the jurors, in light of their oath, "uphold the laws of the Commonwealth"—a duty that is neutral between imposing a life sentence or imposing death. The reference to experience appears simply to have been meant to highlight the difficulty of the jury's task.

Regarding the contention that the prosecutor's closing remarks improperly invoked future dangerousness,[21] the prosecutor was not arguing future dangerousness as a specific aggravating factor—this is evident both from the context of the reference to putting an end to Thomas's ability to harm others, and from the fact that the applicable potential aggravators were specifically delineated on the verdict form. As the jury was required to indicate which of these aggravators it had found, there was little likelihood that the jury would use future dangerousness as one of the aggravators. One is not warranted in concluding that the prosecutor's remarks were so prejudicial as to infect the entire sentencing phase with unfairness.

Finally, the prosecution's references to the Bible seem to have been marshaled for rhetorical force[22]—they do not ask the jury to consider an extra-statutory aggravating factor, and thus do not rise to the level of a constitutional violation. Insofar as Thomas contends such Biblical allusions are contrary to state law, such an argument is not a sound basis for federal habeas review. "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). In any event, a passing reference to Biblical times does not serve to "cloak the prosecutor with a 'spiritual authority,'" as Thomas contends. Petitioner's Memorandum of Law, at 73.

For these reasons, none of the prosecutor's statements at sentencing rose to the level of a constitutional violation, and thus Thomas is not entitled to relief on this claim.

---

**20.** The statement at issue is as follows: "I stand here after doing this for 12 and a half years. Since 1976, ladies and gentlemen, I have tried homicide cases. I have seen and tried homicide cases with every type of thing that could be done to a human causing death. I have tried those kind of cases. It is not easy for me to stand here, nor should it be, for I took an oath like you have taken an oath to well and truly try the issues, and after trying those issues, uphold the laws of the Commonwealth."

**21.** The statement at issue is as follows: "Only you can say stop. I submit to you, ladies and gentleman, that Brian Thomas has used up his chances. I would submit to you that it's time for somebody to say Brian Thomas, you have forfeited your right to live among civilized people by your conduct, by your behavior, what you did, why you did it and how you did it. You should not be allowed to continue. The citizens of Philadelphia can't tolerate you in their midst, take out somewhere where your type of conduct will not ever be a threat to the citizens of Philadelphia."

**22.** The statement at issue was as follows: "[H]istorically, the home has played a major part in our history as well as the porch. We can go back to the Biblical times and there are phrases concerning the home. In my father's house, there are many mansions, home is where you go. When they have to take you in, forgive those who trespass against us. Historically we are talking about the home."

*Claim IX—Improper "life imprison-ment" instruction*

■ In Claim IX, Thomas contends the trial judge erred in failing to instruct the sentencing jury that Thomas was statutorily ineligible for parole if the jury were to impose a sentence of life imprisonment. Particularly since, in Thomas's view, the prosecution sought to make a point of Thomas's "future dangerousness" (advising the jury that "Only you can say stop"), Thomas contends the jury did not have an adequate understanding of what was meant by "life imprisonment." Therefore, Thomas argues, the imposition of a death sentence was based on inaccurate information, in violation of the Sixth, Eighth, and Fourteenth Amendments.

## A.

Thomas's central contention—that his due process rights were violated—relies on an argument substantially similar to the ruling of the Supreme Court in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), a case decided subsequent to Thomas's conviction and sentencing. In *Simmons,* the Supreme Court held that "to the extent this misunderstanding [about the meaning of a sentence of life imprisonment] pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." 512 U.S. at 161, 114 S.Ct. 2187. When the prosecution invokes future dangerousness to support the death penalty and the defendant is statutorily ineligible for parole, the Court held, "the true meaning of [the jury's] noncapital sentencing alternative, namely, that life imprisonment meant life without parole," cannot be concealed from the jury. *Id.* at 162, 114 S.Ct. 2187. But while *Simmons* did establish a due process right to a parole ineligibility instruction in such cases, the Supreme Court three years later held that this requirement constitut-ed a new rule that was not to be applied retroactively. *See O'Dell v. Netherland,* 521 U.S. 151, 153, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997).

As Thomas was sentenced in 1986, eight years before *Simmons,* his claim thus hinges on the requirements of state law at the time of sentencing. As *Simmons* notes, Pennsylvania was one of only a handful of states that had "a life-without-parole sentencing alternative to capital punishment for some or all convicted murderers but refuse[d] to inform sentencing juries of this fact." 512 U.S. at 168 n. 8, 114 S.Ct. 2187. In 1990 the Pennsylvania Supreme Court reaffirmed its longstanding position that "parole, pardon, and commutation of sentence are matters that should not enter in any manner into a jury's deliberations regarding the sentence to be imposed in a first degree murder case." *Commonwealth v. Henry,* 569 A.2d 929, 941 (1990). That court in 1989 upheld a trial judge's refusal to answer a jury's direct question concerning the possibility of parole:

> [W]hether the defendant might at any future time be pardoned or have his sentence commuted is no concern of theirs and should not enter in any manner whatsoever into their consideration of the proper penalty to be imposed, which should be determined solely in the light of the relevant facts and circumstances as they then existed.

*Commonwealth v. Strong,* 522 Pa. 445, 563 A.2d 479, 486 (1989) (quoting *Commonwealth v. Johnson,* 368 Pa. 139, 81 A.2d 569, 571 (1951)). And in 1995, predicting *O'Dell,* the Pennsylvania Supreme Court in *Commonwealth v. Christy* declined to apply *Simmons* retroactively, holding that at the time of the defendant's sentencing, in 1983, it was "well-established Pennsylvania law" that such an instruction was not re-

quired. 540 Pa. 192, 656 A.2d 877, 889 (1995).

Despite this established state practice of not allowing juries to consider parole eligibility, the Third Circuit has made it clear that instructions to juries must not cross the line between no explanation of parole eligibility at all and an inaccurate explanation. In *Carpenter v. Vaughn*, the court held that trial counsel was ineffective for failing to object to the judge's response to a jury question regarding the jury's power to "recommend" a sentence of life imprisonment without parole. 296 F.3d 138, 141 (3d Cir.2002). The problem with the answer, the court explained, was that it seemed to leave the jury with a clear misstatement of the law—specifically, it seemed to state that the defendant might be eligible for parole, when he was statutorily ineligible.

> While it was prudent for the trial judge, in answering the jury's question, to emphasize that its verdict was not merely a recommendation, it is apparent that the jury's concern centered on the availability of a sentence of life imprisonment without parole. And the judge's initial response—'The answer is that simply, no absolutely not'—clearly conveyed the misleading impression that such a sentence was not available.

*Id.* at 157. Therefore, despite the fact that the defendant in *Vaughn* was sentenced well before the new rule in *Simmons,* the failure of trial counsel to object to the judge's clearly misleading statement nonetheless constituted a *Strickland* violation.

Because Thomas's sentencing occurred before the *Simmons* rule took effect, he cannot succeed in showing a violation of due process simply due to the absence of a jury instruction as to parole ineligibility. Any due process violation must be based

on a showing of likely prejudice, such as the judge's clear misstatement of the law in *Vaughn.* However, nothing of this sort has been shown to have happened in Thomas's trial. Thomas contends the prosecutor misled the jury when, in closing, he commented on Thomas's future dangerousness, despite knowing that he was ineligible for parole. But the prosecutor neither misstated the law nor offered any misleading facts to the jury, unlike the judge's response in *Vaughn.* In fact, it is such expressions of future dangerousness that were the impetus for the new *Simmons* rule, and that are the precise trigger for a right to a parole-ineligibility instruction. But because Pennsylvania law at the time did not allow juries to consider parole ineligibility, regardless of any invocation of future dangerousness; because the Supreme Court did not identify this practice as a violation of due process until 1994; and because the Court has held that its recognition of such a violation was not retroactive, the argument that the prosecutor's statements here were a violation of due process is unavailing.

As it does not appear there was any due process violation, there similarly cannot be a *Strickland* violation for trial counsel's failure to object (a) to the absence of a parole-ineligibility instruction or (b) to the prosecutor's closing statement.[23]

### B.

Thomas also contends that a sentence without accurate information is arbitrary and capricious punishment, and that imposing a death sentence without a parole-ineligibility instruction is against the evolving standards of decency, in violation of the Eighth Amendment.

---

**23.** It is unclear whether petitioner is even advancing a *Strickland* claim in this context. He does not seem to be doing so in his petition, but the arguments underlying an ineffectiveness claim are at least alluded to in the subsequent pleadings by both parties.

Although, pre-*Simmons,* Pennsylvania was in the minority of states in its practice of refusing to give a parole-ineligibility instruction under circumstances like Thomas's, and although state legislatures were continuing to move away from this practice, examination of legislative enactments is only a "beginning point" in an Eighth Amendment analysis. *Roper v. Simmons,* —— U.S. ——, ——, 125 S.Ct. 1183, 1192, 161 L.Ed.2d 1 (2005). Indeed, the heart of Eighth Amendment analysis—particularly the "evolving standards of decency" framework—necessarily focuses on the nature of a punishment and whether that punishment is "so disproportionate as to be cruel and unusual." *Id.* at 1190.

Thomas is not contesting the mode of punishment, nor is he arguing that it is disproportionate in the case of his particular crime. His concern, appropriately, is one of process, and thus his Eighth Amendment argument really collapses into his due process argument. There was nothing disproportionate about Thomas's punishment, and the Supreme Court in *O'Dell* clearly rejected the contention that the absence of a parole-ineligibility instruction implicates any basic individual right. "Unlike the sweeping rule of *Gideon* [*v. Wainwright*], which established an affirmative right to counsel in all felony cases, the narrow right of rebuttal that *Simmons* affords to defendants in a limited class of capital cases has hardly altered our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *O'Dell,* 521 U.S. at 167, 117 S.Ct. 1969 (emphasis and internal quotations omitted). Indeed, the Court even went so far as to recognize that "[i]t is by no means inevitable that, absent application of the rule of *Simmons,* miscarriages of justice will occur." *Id.* at 167 n. 4, 114 S.Ct. 2187.

### C.

Finally, Thomas raises a Sixth Amendment "impartial jury" claim. Because this challenge is founded on the same set of facts and underlying arguments about the nature of the instruction, it is subject to the same analysis as the Eighth and Fourteenth Amendment claims above. As there was no constitutional defect in the trial judge's failure to give a parole-ineligibility instruction, given the state of the law in 1986, such a failure cannot by itself create an unconstitutionally partial jury.

### D.

For these reasons, Thomas is not entitled to relief on this claim.

### Claim X—Alleged threat by prosecutor directed toward petitioner's wife

 Thomas contends that after his trial began, a detective asked to speak with Thomas's wife, Debra Johnson, and led her to a restaurant near the courthouse. Thomas alleges that at the restaurant, the prosecutor told Ms. Johnson that if she testified, he "would make sure that [she] had a very hard life." Petitioner's Memorandum of Law, at 97 (alteration in original). Ms. Johnson signed an affidavit to this effect in 1996, ten years after trial; this affidavit appears to be the first time Ms. Johnson had mentioned this allegation to anyone. Thomas says that as a result of this alleged threat, Ms. Johnson decided not to testify, including giving testimony about an alleged hostile relationship between her and one of the jurors.[24]

It is true that defendants have a right to present a defense without "unwarranted interference by the Commonwealth." *Government of Virgin Islands v. Mills,* 956 F.2d 443, 445 (3d. Cir.1992). The existence of a single affidavit, however, signed ten years after the alleged incident,

---

**24.** *See* Claim XIII, *infra.*

hardly constitutes proof of any such interference or misconduct. Putting aside the many reasons posited by the Commonwealth that Ms. Johnson's statement lacks veracity, the Commonwealth rightly points out that there is a major question of fact involved. The disagreement between the parties thus boils down to a legal question: Does the factual dispute entitle Thomas to an evidentiary hearing?

Because Thomas failed to develop any factual basis for this claim in the state court proceedings, the propriety of an evidentiary hearing is governed by 28 U.S.C. § 2254(e)(2) [25]. Pertinent here is the language permitting an evidentiary hearing only if the disputed fact "could not have been previously discovered through the exercise of due diligence," and that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2) (2004). Thomas cites *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) to support his argument that § 2254(e) does not apply here, as the claim was not adjudicated on the merits in state court. However, such reliance misperceives the Third Circuit's holding in *Appel*, which focused on the non-applicability of § 2254(d)—the deferential standard of a federal habeas court's review of state proceedings. The court in *Appel* held that the petitioner's claim must be reviewed *de novo*, as § 2254(d) applies only to claims already adjudicated on the merits in state court proceedings. When claims have not been adjudicated on the merits, however, "the federal habeas court must conduct a *de novo* review over pure legal questions and mixed questions of law and fact.... However, the state court's factual determinations are still presumed to be correct." *Appel*, 250 F.3d at 210. The court went on to cite and apply the standards of § 2254(e)(1). As § 2254(e)(1) was applied notwithstanding the absence of state adjudication, it would seem that § 2254(e)(2) is equally applicable in such a context.

Applying these standards, there is nothing to indicate that Thomas exercised due diligence in advancing or establishing a factual basis in the record for this claim, and Thomas does not contend that he has done so. Had he exercised such diligence, he could have easily learned that his wife had been threatened (assuming, *arguendo*, that she had been threatened). Ms. Johnson's absence from the trial alone, particularly given her status as a potential witness, might reasonably have prompted Thomas to inquire into the reason for this absence. According to Ms. Johnson's affidavit, had she been asked, she would have told Thomas about the threat. In addition to this failure to raise the issue during the trial, Thomas also failed to raise it before the PCRA court. But even if Thomas could get past the "due diligence" threshold of § 2254(e)(2), this single piece of uncorroborated and disputed information is not sufficiently weighty to establish by

**25.** Section 2254(e)(2) reads, in full: "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

 (A) the claim relies on—

 (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

 (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

 (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

clear and convincing evidence that no reasonable factfinder would have found Thomas guilty.

Because the naked allegation of a threat alone cannot establish a constitutional violation, and because Thomas is not now entitled to an evidentiary hearing under § 2254(e)(2), Thomas is not entitled to relief on this claim.

### Claim XI—Erroneous admission of bite-mark evidence at trial

Thomas contends that admission of evidence of a bite-mark on the victim's cheek violated his rights to due process and a fair trial, because such evidence is unreliable. He also argues that the prosecution's witness who presented this evidence was not an expert in the field, and that his testimony was both contradictory and misleading. Further, Thomas argues, trial counsel was ineffective for failing to object to the admissibility of this evidence.

"Pennsylvania has adopted a liberal standard for the qualification of an expert. 'Generally, 'if a witness has any reasonable pretension to specialized knowledge on the subject matter under investigation he may testify and the weight to be given to his evidence is for the jury.' " *Commonwealth v. Henry*, 524 Pa. 135, 569 A.2d 929, 934 (1990) (quoting *Commonwealth v. Gonzalez*, 519 Pa. 116, 546 A.2d 26 (1988)) (additional citations omitted). In addition, Pennsylvania courts have specifically allowed the use of bite-mark evidence, and, provided there is adequate foundation for the testimony, such evidence is not *per se* fundamentally flawed. *See Henry*, 569 A.2d at 934. Thus, any assertion that such evidence is unreliable must go to weight, not admissibility. *See id.*

■ Turning to the qualifications and specific testimony of the Commonwealth's expert, Dr. Mark Snyder, the Commonwealth, through a careful analysis of defense counsel's cross-examination of Dr. Snyder, persuasively argues that counsel's performance was quite adequate. Counsel questioned Dr. Snyder regarding both his qualifications and experience, as well as the substance of his testimony. Thomas also contends counsel was deficient for not presenting a rebuttal expert to challenge the reliability of Dr. Snyder's testimony. While a rebuttal expert may have been more impressive to the jury, defense counsel adequately presented the question of reliability to the jury, and it is unclear what new evidence a rebuttal expert could have presented. One cannot deny that such an expert could have been helpful to the defense, but given defense counsel's diligent attempts on cross-examination to impeach both the qualifications and substantive testimony of Dr. Snyder, the failure to present such an expert neither constituted deficient performance of counsel nor violated Thomas's due process or other rights.

In his reply brief, Thomas requests an evidentiary hearing regarding what trial counsel did or did not do, and what evidence would or would not have been presented had trial counsel retained a rebuttal expert. There is no factual dispute, however, regarding the actions of counsel at trial—the Commonwealth reproduces portions of the transcript in which trial counsel cross-examines Dr. Snyder in both a probing and reasonably thorough fashion. And even assuming, *arguendo*, that evidence presented by a rebuttal expert would have cast some doubt on Dr. Snyder's testimony, such evidence does not meet the high bar set by 28 U.S.C. § 2254(e)(2). Given the ample evidence supporting his conviction, Thomas cannot make the requisite showing that rebuttal expert testimony would have established by clear and convincing evidence that no reasonable fact-finder could have found Thomas guilty.

For these reasons, Thomas is entitled neither to relief nor to an evidentiary hearing on the basis of this claim.

### Claim XII—Improper use of Thomas's criminal trespass conviction as an aggravating factor

Thomas contends it was improper for the prosecution to use Thomas's past conviction for criminal trespass to argue that Thomas had a significant history of felony convictions involving the use or threat of violence. The incident in question involved Thomas breaking into the home of a sleeping woman, entering her bedroom, and climbing into bed with her. Thomas left after the woman awoke and implored him to leave.

At the outset it should be noted that this claim is really one challenging a state's application of state law, which, as noted above, is not a sound basis for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). However, Thomas also contends that the state's allowance of criminal trespass convictions to show a history of felonies involving the use or threat of violence implicates federal constitutional rights, in that such a rule unreasonably expands the statutory requirements for proving an aggravator. While petitioner's argument might conceivably be more persuasive in a situation where no reasonable jury could have concluded that a particular instance of criminal trespass involved a threat of violence, this is hardly the case here. The jury did not act unreasonably when, after hearing the circumstances of Thomas's trespass, it concluded that the threat of violence was present and subsequently found that the prosecution had proved this aggravating factor beyond a reasonable doubt. There was no arbitrary, capricious or unreasonable expansion of the requirement for proving aggravation, and petitioner's attempt to show a sudden shift in Pennsylvania law regarding the classification of criminal trespass as a crime of violence is unpersuasive.

As the basis for aggravation was fairly argued and unanimously found by the jury, and as there was sufficient evidence to support such a finding, Thomas is not entitled to relief on the basis of this claim.

### Claim XIII—Potential juror bias

After the jury had returned a sentence of death, Thomas told his counsel that, Kevin James, who was one of the jurors, had had a hostile relationship with Thomas's wife when the two were in high school.[26] Trial counsel alerted the court and the prosecutor to Thomas's assertion, but counsel did not request an evidentiary hearing on the issue and the court did not hold one of its own accord. Thomas alleges that the presence of this juror contravened his right to be tried by an impartial jury, violating his Sixth, Eighth and Fourteenth amendment rights. In addition, Thomas contends that his counsel's failure to request a hearing was prejudicial and in violation of his constitutional right to effective counsel.

The Commonwealth contests this claim on the ground that juror James did not attend the same high school as Thomas's wife, as the prosecutor advised the court and defense counsel at the time that defense counsel told the court and the prosecutor what Thomas had reported to him about James and Thomas's wife. The Commonwealth thus argues that counsel's failure to request, and the court's failure to *sua sponte* hold, a hearing on a non-issue does not constitute error.

---

**26.** Neither party elaborates on the nature of this relationship, or the events creating the alleged hostility.

In his reply brief, Thomas states that he should get an evidentiary hearing on the matter because there are material facts in dispute. Because the state court, in its colloquy, addressed the factual basis for the claim, this request for an evidentiary hearing is governed by 28 U.S.C. 2254(d),[27] instead of the more rigorous standard contained in 2254(e). Section 2254(d) permits an evidentiary hearing where, *inter alia,* the state court adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

It is at least possible that Thomas can make out a plausible case that the state court decision on this issue was "unreasonable." The state court apparently adopted, without soliciting further information, the prosecution's statement that the juror attended a different high school than Thomas's wife, even though that statement was contrary to Thomas's statement. Further, even if the prosecution was correct, it is not clear that the fact that the two attended different schools disposes of the issue. Students frequently socialize with their contemporaries from other schools, and so it is conceivable that the two knew each other, and that they had the sort of relationship that, some years later, might bias James against Thomas.

It is unlikely, however, that Thomas could demonstrate that he suffered prejudice at the guilt phase by the seating of a hostile, rather than wholly impartial, juror: The evidence of Thomas's guilt was so

massive that it is hard to suppose that a jury every one of whose members was absolutely impartial would have failed to convict him. But when one considers the sentencing phase, the calculus is otherwise. At the sentencing phase, the response of a single juror can be dispositive. If a hostile juror were replaced by an impartial juror, the latter might well have been more inclined to find that mitigating circumstances outweighed the aggravating circumstances. And, since a sentence of death requires that the jury unanimously find that aggravating factors outweigh mitigating factors, 42 Pa.C.S. § 9711(c)(1)(iv), the seating of an impartial juror might mean the difference between a sentence of life imprisonment and a sentence of death. *See generally Caldwell v. Mississippi,* 472 U.S. 320, 340–41 n. 7, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (underscoring the "highly subjective" and individualized nature of a capital jury's sentencing determinations); *Lockett v. Ohio,* 438 U.S. 586, 604–605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (same).

In sum, then, if an evidentiary hearing were to disclose that James did, in fact, have a hostile relationship with Thomas's wife—a finding that might constitute *de jure* bias, *see, e.g., Leonard v. United States,* 378 U.S. 544, 84 S.Ct. 1696, 12 L.Ed.2d 1028 (1964) (per curiam) (finding bias as a matter of law where jurors seated for second of two back-to-back trials involving same defendant were present in the courtroom when the guilty verdict from the first trial was announced); *Smith*

---

**27.** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 USCS § 2254.

*v. Phillips*, 455 U.S. 209, 222, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring)—then it may be that this claim would constitute an alternative ground for awarding Thomas a new sentencing hearing. Because this court has already found that Thomas is entitled to a new sentencing hearing in light of Claims I and II, however, no useful purpose would be served in holding an evidentiary hearing on Claim XIII at this juncture. Accordingly, this claim will be dismissed without prejudice.

### Claim XIV—Inappropriate jury instructions under Mills v. Maryland

Thomas contends that the trial court erred when it gave the jury instructions that may have led the jury to believe that it had to be unanimous in finding a mitigating factor before an individual juror could give effect to that mitigating factor in its sentencing determination.

Thomas's objection to these instructions is based on the Supreme Court's holding in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), that it must be made clear to jurors that they may consider any mitigating evidence, regardless of whether all jurors agree on its applicability. Thomas presents a compelling case that the instructions at his trial did not satisfy the *Mills* standard, particularly in light of subsequent Third Circuit precedent applying this standard. *See, e.g., Banks v. Horn*, 271 F.3d 527, 548–51 (3d Cir.2001) (finding invalid instructions substantially similar to those in the instant case); *Frey v. Fulcomer*, 132 F.3d 916, 924 (3d Cir.1997) (same, with instructions nearly identical to those here).

However, the Supreme Court recently held that the *Mills* rule was not retroactive. *Beard v. Banks*, 542 U.S. 406, 124 S.Ct. 2504, 2513, 159 L.Ed.2d 494 (2004). "*Mills* announced a new rule of constitutional criminal procedure that falls within neither *Teague* [*v. Lane*] exception. Ac-

cordingly, that rule cannot be applied retroactively" to Thomas. *Id.* at 2515. Thus, Thomas has no constitutional entitlement to an application of the *Mills* rule, and he is thus not entitled to relief on the basis of this claim.

### XV—Failure to "life-qualify" the jury

Thomas contends trial counsel was deficient for failing to "life-qualify" the jury during *voir dire*. Although jurors were questioned regarding their ability to impose the death penalty should the law allow or require that penalty, they were not similarly questioned regarding any potential bias against imposing a life sentence in a capital case. Such a right to life-qualification was identified by the Supreme Court in *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

*Morgan* came at the end of several cases addressing dismissal for cause of a juror whose expressed views substantially impair his or her ability to follow the law of capital sentencing. *See, e.g., Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). *Morgan* was decided in the wake of *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), which held that a juror who declared he would vote to impose the death penalty automatically if the defendant were found guilty should have been removed for cause. But while *Ross* established that an expressed intention to automatically apply the death penalty in cases of guilt does constitute impermissible bias, *Ross* did not require trial courts to question potential jurors in order to identify such a viewpoint. Indeed, the Supreme Court specifically granted certiorari in *Morgan* "because of the considerable disagreement among state courts of last resort" on this issue. 504 U.S. at 725, 112 S.Ct. 2222. Thus, not only was *Morgan* the first time

the Court announced that, as a rule, defendants are entitled to an inquiry to "life-qualify" potential jurors, but the disagreement prompting the Court to act indicates that this rule was not simply an intuitive extension of then-current doctrine.

Although the case law discussing the retroactivity of *Morgan* is sparse, those courts that have confronted the issue have held that the *Morgan* rule comes under the "new rule" criteria of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and is thus not retroactive. *See Jermyn v. Horn*, 1998 WL 754567, at *54, 1998 U.S. Dist. LEXIS 16939, at *157 (M.D.Pa., Oct. 27, 1998) ("[W]e cannot conclude here that *Morgan* is a watershed rule of criminal procedure. *Morgan* does not act at the threshold of the jury's deliberations, and we cannot conclude that the jury would not have followed its instructions at the sentencing phase just because the 'life qualifying' question was not asked."); *Commonwealth v. Blystone*, 725 A.2d 1197, 1203 (1999) ("Prior to the *Morgan* decision, the United States Supreme Court had not imposed a mandatory requirement that a defendant be afforded a life qualifying voir dire question upon request.... [U]nder the test enunciated in *Teague*, the holding of *Morgan* announced a new rule and placed a new obligation on the states."); *People v. Caballero*, 179 Ill.2d 205, 227 Ill.Dec. 965, 688 N.E.2d 658, 665 (1997) ("Application of the *Teague* test indicates that *Morgan* should not be applied retroactively because it constituted a new rule. Clearly, the result defendant seeks was not 'dictated' by existing precedent.").

 Under the principles of *Teague*, therefore, Thomas was not entitled to a life-qualified jury. As there was no such right established at the time of Thomas's trial, and as the record discloses no indication at *voir dire* that any of the jurors were inclined automatically to apply the death penalty, counsel was not deficient for failing to request that the jury be life-qualified. And as the Commonwealth points out, even if, *arguendo*, the requirement of a life-qualifying inquiry is not considered a new rule under *Teague*, it is still clear that the right to such an inquiry was a source of "considerable disagreement." Trial counsel cannot be considered deficient for failing to anticipate, in 1985, how the Supreme Court would ultimately resolve this contentious issue.

## Claim XVI—Improper "reasonable doubt" instruction at trial

 In his charge at Thomas's trial, the judge defined "reasonable doubt" as "such a doubt as would cause a reasonable person to *restrain from acting* in a manner of grave importance in his or her own life." *See* Petitioner's Memorandum of Law, at 151 (emphasis added). Thomas contends that the trial court's definition of "reasonable doubt," and the "restrain from acting" formulation, in particular, diminished the Commonwealth's burden of proof beyond what is constitutionally required.

The Supreme Court has confronted this issue on several occasions, consistently holding that the concept of reasonable doubt is amenable to a host of permissible definitions.

> [S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions [must] correctly convey the concept of reasonable doubt to the jury.

*Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (citations omitted). Only in one case—*Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112

L.Ed.2d 339 (1990) (per curiam)-has the Supreme Court rejected as unconstitutional a definition of "reasonable doubt," and there the definition in the jury instructions contained several phrases ("such doubt as would give rise to grave uncertainty," "actual substantial doubt," and "moral certainty," *id.* at 40, 111 S.Ct. 328) that, when taken together, "could have [been] interpreted ... to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause," *id.* at 41, 111 S.Ct. 328. Almost thirty years ago, the Pennsylvania Supreme Court directly addressed this issue, holding specifically that as a matter of state law, the use of the word "restrain" rather than "hesitate" did not constitute an inappropriate instruction. *See Commonwealth v. Brown,* 470 Pa. 274, 368 A.2d 626, 634 (1976).

Since *Cage,* the Supreme Court has clarified that in the case of challenges to a reasonable doubt instruction, "the proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it." *Victor,* 511 U.S. at 6, 114 S.Ct. 1239 (emphasis in original); *see also Tyler v. Cain,* 533 U.S. 656, 658, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001) ("a jury instruction is unconstitutional if there is a reasonable likelihood that the jury understood the instruction to allow conviction without proof beyond a reasonable doubt.").

The Pennsylvania Suggested Standard Criminal Jury Instructions, which Thomas argues should have been followed, defines "reasonable doubt" as "a doubt that would cause a reasonably careful and sensible person to *hesitate before acting* upon a matter of importance in his own affairs." Pennsylvania Bar Institute, *Pennsylvania Suggested Standard Criminal Jury Instructions,* § 7.01(3) (1975) (emphasis added). Although Thomas is correct that this standard instruction has been approved by the Pennsylvania Supreme Court, his contention that this is the "proper" instruction does not find support in the case law. Particularly when taken as a whole, the instructions given to the jury in Thomas's case "adequately conveyed the concept of proof beyond a reasonable doubt and therefore did not violate due process." *United States v. Jacobs,* 44 F.3d 1219, 1226 (3d Cir.1995). Indeed, other federal courts, when confronted with this very issue, have not found any constitutional defect solely due to the use of "restrain" as opposed to "hesitate."

> Although we would agree with Petitioner that the word "restrain" implies a slightly higher level of doubt than does the word "hesitate," we do not find that the trial court's use of the word "restrain" in its reasonable doubt instruction operated to raise the level of doubt so high as to constitute constitutional error. Rather, our review of the instruction as a whole reveals that the trial court adequately defined the meaning and outlined the proper implementation of the concept of reasonable doubt to the jury.

*Peterkin v. Horn,* 176 F.Supp.2d 342, 381 (E.D.Pa.2001); *see also Porter v. Horn,* 276 F.Supp.2d 278, 340 (E.D.Pa.2003) (same).

Given the absence of specific, constitutionally mandated language, the wide latitude given to judges in crafting their instructions, and the fact that both federal and state courts have upheld charges using identical, or substantially similar, language, Thomas's claim of constitutional error is unpersuasive. "[R]estrain from acting" is, concededly, an awkward phrase, but awkwardness is not the same as unconstitutionality. Although the trial judge's formulation did not match, word-for-word, Pennsylvania's suggested standard jury instruction, the instruction given, when taken as a whole, adequately

conveyed the concept of reasonable doubt. Thomas offers nothing to indicate a reasonable likelihood that the jury misapplied the "reasonable doubt" standard, particularly given the compelling evidence of his guilt.

For these reasons, Thomas is not entitled to relief on the basis of this claim.

### Claim XVII—Failure to correct "reasonable doubt" instruction at penalty phase

Thomas contends the trial court erred in failing to correct at sentencing its allegedly erroneous "reasonable doubt" instruction, leaving the sentencing jury with a reduced burden of proof as to the existence of aggravating factors. Because it has already been determined that the guilt-phase instruction was not improper, the trial court clearly could not have committed error in failing to correct an instruction that needed no correction.

### Claim XVIII—Inadequate "preponderance of the evidence" instruction at sentencing

In his Memorandum of Law, Thomas withdrew Claim XVIII.

### Claim XIX—Ineffective assistance of counsel at trial

Thomas contends trial counsel was ineffective for failing adequately to cross-examine or otherwise question witnesses. Specifically, he contends counsel failed effectively to question prosecution witness St. Clair Holman about statements that were allegedly inconsistent with those Holman had previously made to defense witness Janet Lomax, regarding whether Holman, a roommate of Linda Johnson, had ever heard Johnson and her boyfriend fighting. Counsel was also deficient, according to Thomas, for failing to call a police officer, Sgt. Helker, who would have testified that he had taken a statement from Lomax about such fighting in the past. Had counsel more aggressively questioned these witnesses, Thomas contends, the elicited testimony would have further supported the defense theory that Johnson's boyfriend killed her out of jealousy.

This claim is governed by the standards expressed in *Strickland* and its progeny. Under this rubric, Thomas's contention does not meet *Strickland's* first prong of deficient performance. 466 U.S. at 688–89, 104 S.Ct. 2052. Despite Thomas's contentions, the Commonwealth is correct that counsel did question both Holman and Lomax about the jealous-boyfriend theory. In addition, it seems at least questionable whether Sgt. Helker's testimony would have been at all helpful, given the nature of the statement made to him by Lomax, not to mention the fact that there would seem to be significant questions regarding whether this out-of-court statement would even have been admissible. In such a context, Thomas's allegations cannot overcome *Strickland's* presumption of effectiveness.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (citations omitted).

The Commonwealth's view of the available evidence is supported by the Pennsylvania Supreme Court's treatment of this

claim, and this court has no reason to find error with the state court's application of *Strickland*. While the jury apparently did not find the defense's theory convincing, counsel did not fail to present such a theory. And although current counsel might have mounted Thomas's defense in a different manner, the facts alleged by Thomas cannot support a *Strickland* claim. In addition, as the record provides ample guidance as to what evidence was available and what evidence was presented at trial, an evidentiary hearing is unnecessary. On the basis of the clear factual record, Thomas is not entitled to relief on this claim.

### Claim XX—Improper guilt-phase testimony concerning torture

▮▮ Thomas contends that the trial court erred in allowing the medical examiner, Dr. Robert Catherman, to testify as to the pain and suffering experienced by the victim. In his testimony, Dr. Catherman explained to the jury the nature of Ms. Johnson's wounds, and their manner of infliction. In doing so, he pointed out that these injuries would have caused the victim "considerable pain and suffering."

Although petitioner is correct that a "separate sentencing proceeding permits the exclusion from the guilt phase of information that is relevant only to sentencing and that might prejudice the determination of guilt," *Zant v. Stephens*, 462 U.S. 862, 912 n. 5, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Commonwealth is correct in responding that for a claim of prejudicial testimony to rise to the level of a constitutional violation, the probative value of the evidence in question must be "greatly outweighed" by the prejudicial nature of that evidence. *See Lesko v. Owens*, 881 F.2d 44, 52 (3d Cir.1989); *Bisaccia v. Attorney Gen. of N.J.*, 623 F.2d 307, 313 (3d Cir. 1980). In addition, great deference must be given to the trial judge's discretion in weighing the probative value of evidence against its potential prejudicial effect.

The "standard is inexact, requiring sensitivity on the part of the trial court to the subtleties of the particular situation, and considerable deference on the part of the reviewing court to the hands-on judgment of the trial judge." *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir.1986).

As the Pennsylvania Supreme Court explained in reviewing this claim on direct appeal, Dr. Catherman's testimony

> was not overstated or dramatic and, in fact, was a natural inference to be drawn from the evidence. It does not require much skill or scientific expertise to know that ramming a crutch up one's vaginal opening for twenty-three inches and stuffing a shirt up one's rectum using the same impaling device would cause one considerable pain and discomfort.

*Thomas–I*, 561 A.2d at 706. Furthermore, "[e]vidence of continuing infliction of excruciating pain is relevant to the issue of intent to kill." *Id.* Notwithstanding Thomas's contention to the contrary, Dr. Catherman's testimony did have significant probative value, with respect to the existence of malice. *See, e.g., Commonwealth v. Paquette*, 451 Pa. 250, 301 A.2d 837, 840 (1973) ("Malice can be inferred from the surrounding circumstances, such as the use of a deadly weapon on a vital part of the body of another human being.... Malice can also be inferred from the nature of the wounds where the defendant is not using a deadly weapon.") (citations omitted). This court is hardly in a position to disagree with the trial court that Dr. Catherman's extremely limited and, indeed, sterile description and characterization of the wounds was so prejudicial that it "greatly outweighed" its probative value, 881 F.2d at 52.

As both the prosecution and Dr. Catherman appear to have confined their questioning and testimony to the bare facts, they were well within the bounds of what

the Constitution allows during the guilt phase.

### Claim XXI—Ineffective assistance for failure to challenge hair analysis

▮ Thomas contends trial counsel was ineffective for failing to object to and otherwise challenge testimony by a police department chemist concerning hair found on the crutch used to inflict some of Linda Johnson's injuries. At trial, the Commonwealth called an analytical chemist to testify that hair found on a crutch lying next to the victim at the crime scene belonged to the victim. Thomas argues that admission of this testimony constitutes error because the science of hair analysis is unreliable and inherently subjective and because the chemist testified outside the scope of his expertise, having taken only one course in hair and fiber analysis. Counsel was ineffective, Thomas contends, for failing adequately to challenge this witness on his "expertise" and the scientific basis for his claims.

However, while it does not appear that Thomas's counsel did all that might have been done to challenge the chemist's testimony, Thomas has not established that he was significantly prejudiced by the admission of this testimony. The evidence in question was not used to link Thomas to the crime; instead, it was used to support the proposition that the crutch was the instrument used to puncture the victim's abdominal cavity. Even without this testimony, however, there would likely have been sufficient evidence for the jury to find that the crutch was the "weapon" used by the killer, as it was lying next to the victim and was wholly consistent with the wounds described by the medical examiner. To reiterate the *Strickland* standard for prejudice, "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. 2052. No reasonable probability exists here, for the reasons just discussed. In addition, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* Here, one can hardly say the verdict was weakly supported by the record.

Since admission of the evidence itself was not prejudicial, Thomas cannot make out a valid ineffectiveness claim based on this admission.

### Claim XXII—Improper police testimony during penalty phase

In his Memorandum of Law, Thomas withdrew Claim XXII.

### Claim XXIII—Prejudicial effect of cumulative errors at trial and sentencing

Thomas contends that this court must consider the cumulative effects of the alleged error at trial and sentencing. But while such consideration of cumulative effects may be appropriate in the case of numerous individual instances of error and prejudice, with the exception of Claims I and II, and with the possible exception of Claim XIII, the merits of which the court does not reach, this court does not find Thomas's individual claims of error to have merit.

Therefore, Thomas is not entitled to relief on the basis of this claim.

### V.

Earlier this month, at the annual meeting of the American Bar Association, Justice Stevens conferred on his friend Abner Mikva—former Counsel to President Clinton, and former Chief Judge of the United States Court of Appeals for the District of Columbia Circuit—the Association's Thurgood Marshall Award. Being called on to make the presentation was, Justice Ste-

vens said, "especially gratifying because" it gave him "an opportunity to reminisce about friendships that" the Justice and his wife "especially cherish." In talking about his late colleague, Justice Marshall, Justice Stevens of course spoke of Marshall's triumphant appellate advocacy in *Brown v. Board of Education*, but he also observed that Marshall's "years of dedicated advocacy in countless trial court proceedings in hostile surroundings provide even stronger evidence of his heroic contribution to the cause of civil rights and equal justice." Justice Stevens then noted Marshall's opposition to capital punishment, and the Justice went on to point out some of the procedural aspects of the process that give particular cause for concern. One aspect to which Justice Stevens referred is that, "as many have pointed out and as our cases reveal ... a significant number of defendants in capital cases have not been provided with fully competent legal representation at trial."

Sadly, the case at bar exemplifies this problem. Brian Thomas was adequately represented at the guilt phase of his trial, and so his conviction will not be disturbed. But Thomas was not adequately represented at the penalty phase of his trial. For this reason, the death sentence imposed on Thomas will be vacated. If the Commonwealth elects to seek the death penalty again, there will be a new sentencing hearing at which Thomas will receive competent representation. In the alternative, the Commonwealth may elect to acquiesce in the imposition of a sentence of life imprisonment without parole.

### ORDER

For the reasons set forth in the accompanying opinion, it is hereby ORDERED that Thomas's petition for habeas corpus relief shall be GRANTED to the extent that petitioner seeks a new sentencing determination. That petition shall be DE-NIED to the extent that petitioner seeks a new determination of guilt.